VALVOLINE OIL CO. v. HAVOLINE OIL CO. et al.

(District Court, S. D. New York. December 23, 1913.)

1. TRADE-MARKS AND TRADE-NAMES (§ 93*)—UNFAIR COMPETITION—EVIDENCE CONSIDERED.

The adoption and use by defendant of the word "Havoline" in its corporate name and as a name for gas engine and automobile lubricants *held* not to constitute unfair competition with complainant, the Valvoline Oil Company, which with its predecessor had for many years used the name "Valvoline" as a trade-mark for illuminating and tempering as well as lubricating oils, where it was shown that the name of defendant's predecessor which first adopted the name was the Havemeyer Oil Company, that the suffixes "oline" and "line" were in common use for oils of all descriptions, and that defendant had not imitated complainant's packages nor used other means to deceive purchasers, but had largely advertised its name and products and built up a business therein which greatly exceeded complainant's in the same lines.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104–106; Dec. Dig. § 93.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 59*) — INFRINGEMENT — "VALVOLINE" AND "HAVOLINE."

The word "Havoline," as a name for gas engine and automobile lubricants, *held* not an infringement of the trade-mark "Valvoline," as applied to lubricating, illuminating, and tempering oils.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 68–72; Dec. Dig. § 59.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 86*) — SUIT FOR INFRINGEMENT — LACHES.

A delay of several years before commencing suit for infringement of a trade-mark, with knowledge that the defendant was openly using the alleged infringing name and expending large sums in advertising its product thereunder, constitutes such laches as to require a court of equity, in view of modern business conditions, to deny injunctive relief as well as an accounting.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. § 86.*]

In Equity. Suit by the Valvoline Oil Company against the Havoline Oil Company and the Indian Refining Company of New York. Decree for defendants.

Steuart & Steuart and Sidney R. Perry, all of New York City, for complainant.

Henry B. Brownell and John P. Bartlett, both of New York City, for defendants.

MAYER, District Judge. The suit is brought to enjoin defendants from using the word "Havoline" on gas engine and automobile lubricants. The complainant claims that this word infringes its trade-mark "Valvoline," used on oils in general, including lubricating oils of various kinds, and also illuminating and tempering oils. In addition, complainant alleges unfair competition arising through the use of the word

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Havoline" and in the use of the corporate title "Havoline Oil Company."

The bill also charges infringement of complainant's emblem trademark by reason of the use by defendants of an emblem bearing the word "Havoline." These emblem marks are as follows:

The following is complainant's emblem mark:

The following is defendant's emblem mark:

The defenses are: (1) No infringement; (2) no unfair competition; and (3) laches.

Complainant's business of manufacturing and selling lubricating oils, greases, and other petroleum products was founded in 1868 by its predecessors Leonard & Ellis, a partnership. In 1873 this firm adopted and used as a trade-mark for its goods, the word "Valvoline." This trademark was registered in the United States Patent Office, October 14, 1873, No. 1,502, and again on May 31, 1881, No. 8,289. In 1901 the complainant corporation was organized, and in due course became the successor in business of Leonard & Ellis, and the owner by assignment of the trade-mark registrations. Complainant, in its name, registered the trade-mark "Valvoline" in the United States Patent Office, February 4, 1902, No. 37,754, again May 29, 1906, No. 53,237, and again October 23, 1906, No. 56,816. Complainant does not confine its mark to lubricating oils, but also uses it on illuminating and tempering oils, while defendants' mark "Havoline" has always been confined to automobile and gas engine lubricants. The validity of and title to the trademark "Valvoline" was established in the Circuit Court of the United States for the Southern District of Ohio as far back as 1889. Leonard v. White's Golden Lubricater Co., 38 Fed. 922.

[1] Complainant has done a considerable business throughout the United States and in other parts of the world in its oils generally, and "Valvoline" has been exhibited and displayed at various expositions and has received awards and medals for excellence. In 1904 Havemey-

er Oil Company, defendants' predecessor, adopted the mark "Havoline." The cable address of this company was "Havoil," which was adopted about the time of the organization of the Havemeyer Oil Company in 1901. This cable word "Havoil" was coined from the first syllable "Hav" of the name "Havemeyer" and the word "oil."

At the time that the word "Havoline" was adopted, the suffix "oline" or "line" had become familiar in connection with oils and oil products. The first use of this suffix seems to have been in the word "Cosmoline" in 1870, and since then trade-marks have been registered for use in connection with various kinds of oils, some of which are as follows:

"Puroline," registered 1871, No. 164, for illuminating oils or burning fluids.

"Amberline," registered 1871, No. 163, for lubricating oil.

"Carboline," registered 1873, No. 1,133, for coal oil, i. e., illuminating oil.

"Septoline," registered 1876, No. 4,003, for illuminating oil.

"Roseoline," registered 1880, No. 7,833, for lubricating and illuminating oils, etc.

"Hanoline," registered 1895, No. 26,686, for illuminating oil.

"Vacuoline," registered 1896, No. 28,937, for oils and lubricants of all kinds.

"Cycoline," registered 1896, No. 29,179, for illuminating oil.

"Fusoline," registered 1899, No. 32,592, for lubricating oil.

"Autoline," registered 1905, No. 47,509, for lubricating oils.

It is true that some of these marks were used in connection with illuminating and not lubricating oils, and that the marks registered under the act of 1870 come within the decision of the Supreme Court in the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, declaring that act unconstitutional, and it is also true that there is no evidence of the actual use in commerce of these marks except "Cosmoline" and "Autoline." These facts, however, do not affect the proposition that the suffix "oline" or "line" had become so well known and familiar that when the Havemeyer Oil Company used that suffix it was using a familiar suffix—all to the point that there was not any purpose or intent to appropriate the particular ending of the mark used by the Valvoline Oil Company.

On April 9, 1907, the mark "Havoline" was registered (No. 61,806). In the same year the Havoline Oil Company was organized by the owners of Havemeyer Oil Company and, later, acquired the title to the Havoline mark and now holds it.

In October, 1909, Indian Refining Company of New York (organized in May of that year) purchased all of the capital stock of Havoline Oil Company; the purchase price being $150,000, which covered the stock of both of these companies. In 1910 Havemeyer Oil Company was dissolved. Since June, 1909, Indian Refining Company of Maine has been the exclusive manufacturer of the Havoline products. The Maine corporation owns all the stock of a New York corporation of like name which is a defendant here.

The testimony establishes a course of business by the owners of "Havoline" which demonstrates that they were developing their product

on its own merits and seeking to acquire a trade individuality for "Havoline" as against competitors, including complainant. With a single exception (to be later commented upon), there is nowhere in this record that evidence which is so often found in trade-mark or unfair competition cases. There is no invasion of the other's territory by tricky or unfair means, no misleading by similarity of appearance in the packages or containers in which the product is put up, no specious effort at artificial differentiation when the real purpose is to appropriate another's ability, effort, and commercial success.

On the other hand, it is plain that "Havoline" has succeeded because its owners have employed energetic, up-to-date business methods and have expended substantial sums to make their product widely known. Of course, success in business does not last long unless the public is satisfied with the price and quality of the article, and, in these directions also, good judgment seems to have been exercised by the "Havoline" owners. The sales of "Havoline" show the progress made in a business less then eight years old when the testimony in this record was taken (1905–1912). The later sales and receipts were as follows:

|      |           | Barrels | Amount     |
|------|-----------|---------|------------|
| 1909 |           | 20,000  | $400,000.  |
| 1910 |           | 28,000  | $415,000.  |
| 1911 |           | 23,000  | $375,000.  |
| 1912 | (8 mos.)  | 25,000  | $350,000.  |

Respecting the business of complainant, Mr. Ellis, its president, was asked these questions and gave these answers:

"X-Q. 337. How much Valvoline oil marked "Motor oil" did the Valvoline Oil Company sell in the year 1911; that is, about how much? A. I can only guess at that, and I would say a good deal more than a thousand barrels, in one kind of a container or another.

"X-Q. 338. And, roughly speaking, would you say between one and two thousand barrels? A. Yes, possibly more. I didn't prepare myself for such questions, as I didn't think they would be asked in a trade-mark suit.

"X-Q. 339. In your answer to X-Q. 240, you say, 'On second thought, I wouldn't be surprised if 25 per cent. of the sale was still branded " 'Gas Engine Cylinder Oil." ' When you say '25 per cent. of the sale,' what were you referring to, the sale of what? A. I was referring to all the oil that was sold for automobiles, marine engines, and stationary gas engines, similar to automobile engines, and motors of all kinds, operated by gasoline or naphtha or kerosene, or fuel oil."

Thus, it appears that the sales of "Havoline" were far in excess of "Valvoline" motor oil.

Of course, the amount of sales is not a standard whereby to determine whether competition is unfair, but in this case it is of service, with other facts, in ascertaining whether "Havoline" was marketed on its own merits or on the reputation of complainant.

The advertising of complainant has been comparatively small, while that of defendants has been extensive and has invaded every field of advertisement for this kind of product. From about $5,000 spent in 1909, the advertising expenditures rose to over $25,000, in 1911. I think it may fairly be said that including 1912, at least $100,000 has been spent in advertising "Havoline."

Advertisements have been inserted in leading magazines of general

interest, as well as in magazines specially devoted to automobiling, motor boating, and sports generally. Tour books and display racks have been distributed, and there has been extensive outdoor advertising, including road signs, devices such as pennants, placards, and the like at athletic games and sporting events.

The owners of famous motor boats, as well as noted aviators and automobile racers, have used "Havoline." Men of this kind know what they are doing. Their sports are perilous, and, when they buy oil for their engines, it is to be presumed that they understand what article they are buying.

The colors on the "Valvoline" and "Havoline" cans are different, the wording is different, and the arrangement is different.

"Valvoline" has used the catch phrase, "Best by every Test," while "Havoline" has endeavored to make familiar, "It makes a difference."

How any one can be mistaken in readily distinguishing "Valvoline" as sold in the market from "Havoline" as sold in the market, I cannot understand. It is true that in a few inconspicuous instances defendants used the phrase, "Best by every Test."

This was done by an advertising manager now dead. Whether his course was due to an excess of zeal or to a supposed right cannot now be determined; but, when it is noted that this phrase was not used on defendants' containers, that defendants' efforts have been to make the public familiar with its own slogan, and that the instances were so few, the conclusion must follow that this conduct of the advertising manager is of no importance on the question of unfair competition.

In view, then, of the course of the business of these litigants above outlined, and the manner and method of sale of the products, this is not a case of unfair competition.

[2] We then come to the question of trade-mark infringement. I am of the opinion that the words are distinct from each other and that there is no confusion. There are, of course, many cases in the books in which the courts have made clear that they cannot be deceived by disingenuous distinctions (N. K. Fairbank Co. v. Central Lard Co. [C. C.] 64 Fed. 133, and many others which could be cited); but here there is a real distinction in sound, in appearance, and, popularly speaking, in meaning.

If I did not know anything about motor oils, and some one told me to buy "Valvoline," the word "valve" would be impressed on my mind. True, "Valvoline" has been held not to be descriptive, yet just as the English court held (Leonard & Ellis' Trade Mark, L. R. 26 Ch. Div. 288, and In re Leonard & Ellis v. Wells, L. R. 26 Ch. Div. 288) that the word meant valve oil, so would I, as a purchaser, think that it had something to do with valves. Of course, I would soon discover that "Valvoline" had a wider meaning, but when I heard "Havoline" I would think that it was some coined word or perhaps some technical term, and it would not suggest "Valvoline" to me.

Thus it seems by every test, including that indicated by Judge Lacombe in National Biscuit Co. v. Baker (C. C.) 95 Fed. 135 (Uneeda and Iwanta), that there is no infringement here.

211 F.—13

I have examined the instances in this record of alleged confusion, for in doubtful cases actual instances of confusion may be helpful in arriving at a correct decision; but I am not impressed with the testimony on this branch of the case. Without analyzing the record in detail, it may be said that thoughtless errors by very inattentive people cannot be the standard in dealing with an article of this character, nor can a wholesaler be held responsible because an occasional unscrupulous dealer without his knowledge or consent tries to deceive the purchasing public.

[3] Holding these views, it is not necessary to discuss at length the question of laches. However, in a case so thoroughly prepared as this by both sides, counsel are entitled to the view of the trial judge on an important question.

The testimony is that a retail store for the sale of "Havoline" products was opened in 1906 on Broadway in the center of the automobile district in New York City. This store has been maintained ever since. Complainant knew of defendants' mark in 1906 and knew that it was being used continuously ever since.

"X-Q. 261. When did you first hear of the Havoline brand of motor oil? A. I can't remember in regard to the word 'motor oil,' but in regard to Havoline oil it may have been Havoline Cylinder, or it may have been Havoline oil plain, or it may have been Havoline motor oil, which I can't remember, but as I remember it first it was Havemeyer Oil Company's Havoline oil, of some grade I do not remember. It was the same year that they established their depot on Broadway near Sixty-Fourth or Sixty-Third street. I called in on them at the time I first saw it and notified them that that was too similar a brand to our Valvoline brand, and that, if they intended to register it, I should oppose it, and I found out afterwards that it had just been registered or, in other words, the advertising time that I could oppose it had expired within a very few days previously. Hence, this suit; otherwise I would have opposed it at the time they tried to register it, the same as I did 'Wolverine,' which latter trade-mark was applied for by the same man, Mr. Tomlinson.

"X-Q. 262. Whom did you see when you called in on them, as stated in your last answer? A. I do not know that I asked him his name; I asked him if he represented the Havemeyer Oil Company that was selling Havoline oil. He said he did.

"X-Q. 263. Do you now know whom it was that you saw at that time? A. No, I have not inquired since."

The notice to the unidentified person at the Broadway depot cannot be regarded as binding on defendant, but it does show knowledge by complainant of the use of the word "Havoline."

I think we must realize modern conditions. Men can build up new businesses these days in a period of time which would have seemed amazingly short years ago. It is true that mere acquiescence will not preclude injunctive relief, but, whether a case falls within the principle of Menendez v. Holt, 128 U. S. 523, 9 Sup. Ct. 143, 32 L. Ed. 526, or within Richardson v. Osborne (C. C.) 82 Fed. 92, affirmed 93 Fed. 828, 36 C. C. A. 610, depends, of course, on the particular facts and circumstances. Where a trade-mark is bodily appropriated, as in Menendez v. Holt, the courts will grant injunctive relief, although in some instances denying an accounting. See, also, Mosler v. Lurie, 209 Fed. 364, 126 C. C. A. 290 (C. C. A. 2d Circuit) decided November 11, 1913.

But this is not such a case. It must be admitted, even if it were to be held that the defendants infringed complainant's trade-mark, that the question involved is seriously debatable.

I am of opinion that equity as applied to modern business developments requires that, in this particular case, injunctive relief in any event be denied. No satisfactory explanation is given for the delay, and, during that time, the defendants have spent thousands of dollars to create a valuable asset in the word "Havoline." Complainant is not uninformed, as in Mosler v. Lurie, supra, but is a business corporation in this very same kind of business.

There are cases where delay is excusable because it is necessary to obtain essential testimony or because a person unfamiliar with the subject-matter is ignorant of his rights, or where there is some situation that shows that a defendant should not be permitted to go on with his own wrongful conduct just because he has continued it for a long time.

But it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question.

It is not unlikely that, had complainant in 1906 properly notified defendants' predecessor, the latter would just as soon have adopted some other mark; and, if not, then the controversy could have long since been decided without substantial loss to anybody.

I think there will be very little protection for investors, if, after finding that a duly registered trade-mark has been extensively advertised, that no suit has ever been commenced in respect thereof, that there has not been any appropriation of the name of a company or its brands or trade-mark by an obvious simulation, they nevertheless are subjected to a decree which seriously impairs the value of the property they have acquired.

That complainant, in any event, would not be entitled to an accounting, is clear under the authority of Menendez v. Holt, supra, and Mosler v. Lurie, supra, and for the reasons outlined I am also satisfied complainant is not entitled to prevail on any theory.

The bill is dismissed, with costs.