## BEECH-NUT PACKING CO. v. P. LORILLARD CO.

(District Court, D. New Jersey. May 7, 1924.)

1. **Trade-marks and trade-names and unfair competition ⬅➡31—Right confined to merchandise of same descriptive properties.**

   The right to use word for trade-mark purposes is usually, if not always, confined to merchandise of same descriptive properties.

2. **Trade-marks and trade-names and unfair competition ⬅➡31—Classification of tobacco products by Patent Office raises presumption.**

   Classification by Patent Office, by which "tobacco products" were placed in class by themselves, and "foods and ingredients of foods" in class by themselves, raises presumption that trade-marks adopted for foods is not to extend over other classes, under Trade-Marks Act Feb.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

20, 1905, § 5 (b), being Comp. St. § 9490, limiting trade-marks to merchandise of same descriptive properties.

3. **Trade-marks and trade-names and unfair competition ☞23, 61—Trade-mark is right appurtenant to established business.**

There is no such thing as property in trade-mark, except as a right appurtenant to an established business, and a trader cannot prevent another trader from applying this mark to goods which are not of same description.

4. **Trade-marks and trade-names and unfair competition ☞32—Trade-mark held not abandoned.**

The trade-mark "Beechnut," set aside with a thousand or more trade-names to a tobacco company on dissolution of a trust by the United States, *held* not abandoned by its mere nonusage for several years, though on its revival it was applied to a new kind of tobacco and a different label, and was changed to "Beech-Nut."

5. **Trade-marks and trade-names and unfair competition ☞32—Change of formula not abandonment.**

Change of formula does not indicate abandonment of trade-mark.

In Equity. Suit by the Beech-Nut Packing Company against the P. Lorillard Company. Bill dismissed.

See, also, 287 Fed. 271.

Offield, Bulkley, Poole & Scott, of Chicago, Ill. (Walter A. Scott, of Chicago, Ill., of counsel, and Charles C. Bulkley, James R. Offield, and H. McClure Johnson, all of Chicago, Ill., on the briefs), for plaintiff.

Treacy & Milton, of Jersey City, N. J. (Livingston Gifford, of New York City, John Milton, of Jersey City, N. J., and Richard B. Cavanagh, of New York City, of counsel, and J. Granville Meyers, of New York City, and Thomas L. Preston, of Richmond, Va., on the briefs), for defendant.

LYNCH, District Judge. The plaintiff, a New York corporation engaged in the manufacturing and selling of food products, complains that the defendant, a New Jersey corporation engaged in the manufacturing and selling of tobacco, has damaged the plaintiff's reputation and good will by willfully and fraudulently adopting the plaintiff's trade-mark "Beech-Nut" as a label for tobacco products, for and on account of which the plaintiff prays an accounting for past damages and an injunction enjoining the defendant from further use thereof. The defendant, admitting the use complained of on certain brands of chewing tobacco and cigarettes, asserts a legal right thereto and prays a dismissal of plaintiff's bill. The word "Beechnut," or "Beech-Nut," was years ago adopted as a label by the predecessors in business of both parties to this action. A brief history thereof is advisable.

About 1897 the Harry Weissinger Tobacco Company, a Kentucky concern, adopted it for a combination smoking and chewing tobacco, which was put up and sold in small packages. The tobacco was described as being of "superior quality Havana cuttings," and was what was and is known as a scrap tobacco. Following is a copy of the label [original being manilla, printed in red] adopted and used by Weissinger (Exhibit No. 17):

Factory No. 6, First District, State of Ohio.

NOTICE.—The manufacturer of this Tobacco has complied with all the requirements of Law. Every person is cautioned under the penalties of the law, not to use this package for Tobacco again.

It will be noted that the word "Beechnut" is spelled without a hyphen; that the form of the label, in which not only the word "Beechnut" appears, but a description of the contents and the name of the manufacturer as well, is square, and that immediately underneath the word "Beechnut" is the print of a squirrel. The tobacco so labeled was sold on the market in Kentucky and adjoining states for a number of years subsequent to 1897. The right to make and sell it passed by assignments, stock transfers, and otherwise from the Weissinger Tobacco Company first to the Continental Tobacco Company, next to the Luhrmann & Wilbern Tobacco Company, of Middletown, Ohio, and finally to the American Tobacco Company, where it resided when the latter company was dissolved by the United States Supreme Court during the year 1911. From 1897 to 1911 the tobacco continued to be manu-

factured, sold, and dealt in by these various companies. For some years prior to 1911, however, the demand for it was gradually lessening; the output reaching a very low ebb in 1911.

The decree dissolving the American Tobacco Company apportioned to the P. Lorillard Company, the defendant, a large number of tobacco trade-marks and brands, including *the word* "Beechnut." At that time the sale of "Beechnut" tobacco was practically nil. Up to that time, however, at least, the word had been continuously used as a trade-mark for smoking and chewing tobacco in substantially, if not precisely, the original form adopted by the Weissinger Company back in 1897, although, as we have indicated, the sales had almost completely fallen off. And up to this time (1911) the right to use the word "Beechnut" as a trade-mark in connection with smoking and chewing tobacco does not seem to have been assailed—certainly not by the plaintiff in this suit or by its predecessor in business. That predecessor was the Imperial Packing Company, which in 1892 adopted the word "Beech-Nut" (spelled with a hyphen) as its label for a few food products, such as bacon and ham, which it then manufactured and sold. In about 1899 the Beech-Nut Packing Company was formed, succeeding the Imperial Packing Company. Thereafter the food product business of the plaintiff, growing rapidly, was extended to a variety of products, all relating to food, such as peanut butter, baked beans, chili sauce, tomato catsup, jams, jellies, vinegar, olive oil, ginger ale, mints, chewing gum, etc., in addition to ham and bacon, all of which were labeled "Beech-Nut" and sold as the product of the Beech-Nut Packing Company. An illustration of the plaintiff's label follows:

[The shaded band oval was red in original. Printed matter within the band oval was in blue, except the beech-nut and leaf. Each edge of the band oval was gilt. The beech-nut and leaf was in brown and green. Letters in the band oval appeared in white.]

It will be observed that this label is oval-shaped; that within the oval are three pictures of beechnuts, one in the center and one on each side of the oval. Printed across the top will be found the words "Beech-Nut Brand" and across the bottom the name of the particular article which is contained in the package. From the smallest kind of a beginning in 1891 or 1892 the Imperial Packing Company and its successor, the plaintiff, built up a business which in the year 1919 approximated receipts of $12,000,000.

The Lorillard Company had been in the tobacco business for many, many years prior to 1892, utilizing a great variety of trade-marks and labels in the huge tobacco trade which it had succeeded in establishing. The name of brand or trade-mark "Beechnut" coming to it in 1911 was not at once utilized in the original Weissinger form or otherwise. Nor were any of the 1,000 or more other trade-marks listed on type-written sheets which the defendant company acquired at the apportionment which we have already referred to. The lists containing all of these names or brands were put aside for future reference.

In 1911 the defendant was manufacturing and distributing such well-known cigarettes as "Murad," "Mogul," "Egyptian Deities," "Helmar," "Egyptian Trophies," and the well-known tobaccos "Climax" and "Sensation," besides a large number of other well-known brands. One of these other brands was known as "Honest." There is testimony on behalf of the defendant company that the sales of this "Honest" tobacco had, for a long time, been falling off. We think it is common knowledge that tobacco brands come and go. But, be that as it may, the defendant in or about the fall of 1914 conceived the idea of putting upon the market a new scrap chewing tobacco, a new brand. The formula therefor was worked out, the blend was perfected, and a name considered. The defendant quite naturally consulted its lists of names or trade-marks which a few years prior thereto had come to it from the dissolved American Tobacco Company. Names on that list which had theretofore been identified with scrap tobacco were, of course, first considered. There were but eight or nine of such names, among which were "Bag Pipe," "Panhandle," "Natural Leaf," and "Scrap Iron." It was discovered that most of these "scrap" names were at the time being used as names for tobaccos then on the market, which fact limited the selection to two or three names. Among the two or three available was "Beechnut." So "Beech-Nut" was selected and adopted. This new scrap tobacco, which was designed for chewing only, was not, however, put out in the old Weissinger "Beechnut" wrapper. That old wrapper described "Beechnut" as a chewing and smoking tobacco. It had not been manufactured for two or three years, and there does not seem to be anything in the case to justify the conclusion that it had been sold during that period of time. It had just about died out, as tobacco brands often do. And as the new "Beech-Nut" tobacco was of a different character, it was decided by the defendant company to change that old wrapper to one more in accord with the facts and the times. The wrapper decided upon follows [light rays and beech nuts in red; balance of printing in blue, except the matter appearing with "Notice"; both sides of the wrapper being here shown:

It will be observed that, instead of a square label covering almost the entire package, the changed wrapper has what has been termed a sunburst or radiating effect, in the center of which is an oval in shape somewhat similar to the oval of the plaintiff. Across the top of the oval, inside, the word "Beech-Nut" with a hyphen was placed. Underneath the word "Beech-Nut" the defendant placed the outline of a beechnut *upside down*. Other words placed by the defendant on its label were "Chewing," "Tobacco," "Full Weight," "Extra Picked," and across the top was printed "Lorillard's." The red band oval [shown above in stipple shading] of the plaintiff was not adopted. Instead the defendant adopted an oval which was quite similar to ovals which were common at the time. (See the exhibits.)

This new "Beech-Nut" scrap tobacco, introduced in 1915, within a few years was developed into a business of unbelievable proportions. Selling to the trade at less than the retail price of 10 cents per package, its sales in 1919 amounted to $14,000,000 per year to the manufacturer, approximately $2,000,000 over and above the receipts of the plaintiff for its entire output. Many persons inquired concerning it. Some of them wrote to the plaintiff, the Beech-Nut Packing Company, regarding it, and the plaintiff for a time turned these letters over to the defendant for attention.

Then there developed some correspondence between the parties regarding the use by the defendant of this revised or revamped "Beech-Nut" label. This correspondence, which contains a history of the case and the attitude of the parties, is important enough to be set out herein. It follows:

"Beech-Nut Packing Company.

"Canajoharie, N. Y., 6/11/15.

"Lorillard Co., Middletown, O.—Dear Sirs: We adopted many years ago as our trade-name the word 'Beech-Nut,' arbitrarily selected by us as the mark or name for our manufacturing output of food material. We also associated with such trade-name 'Beech-Nut,' and as a part of the trade-mark, an oblong or oval frame or border of a red color surrounding and inclosing a white oblong space with a picture or representation of a beechnut centered therein.

"We have built up during the last quarter of a century a vast trade in our products and always with our trade-name or trade-mark associated therewith. We have expended a very large sum of money in so doing, and the word or name 'Beech-Nut' and our trade-mark has become of vast value to us, ·not only for these reasons, but for the reason of a high quality and perfection of the various products manufactured by us to which this name and mark has been applied.

"So completely has this name·and mark been attached to and associated with our goods during all of these years that the purchasing public has come to recognize this name and mark as our property as to origin, and to purchase the manufacture and output to which this name and mark is applied, without any further identification as to the origin of the word or name itself, believing that wherever they see our name and mark applied that we are the manufacturers of the product and purchase accordingly.

"We have from time to time added to the variety of our manufacturing commodities to which this name or mark has always been applied, as, for example, a chewing gum product of somewhat recent production upon our part. While we have never as yet manufactured tobacco, the taking on of such manufacture in the future is by no means impossible or improbable. You will also see that the name or word 'Beech-Nut' is a part of our corporate name. We have been thus particular to state this matter to you by reason of the acts upon your part which now follow.

"We have been shown a lined bag, evidently employed for packing 'Beech-Nut Scrap Tobacco,' apparently manufactured by one of your factories at Middletown, O. A prominent feature upon the bag is our trade-name 'Beech-Nut,' including the oval band and our characteristic burrs and nuts. It is difficult to believe that the presence of our trade-name 'Beech-Nut' and mark upon the bag will not deceive the purchasing public in the belief that the contents of the bag are of our manufacture, and to us there is no other explanation to be given to the presence of our trade-name 'Beech-Nut' and mark upon this bag, except the intention on your part that the public shall be so deceived, and you will sell your tobacco by reason of the presence thereon of our name and mark. In other words, these acts strongly indicate to us intentional unfair trading.

"We have decided in the first instance to write you fully as to this matter and present to you our view of your acts, and to request to you immediately to cease this use of our name and mark and give us written assurance of the same.

"We have confidence that, now your attention is called to it, you will recognize ·the justice of our position and that there will hereafter be no necessity of using any harsher course to enforce recognition of the same. We have been thus particular, also, for the reason that there can be no contention hereafter that we have not fully stated your position and ours in this matter. An early reply upon your part is requested and expected.

"Yours very truly,                                Beech-Nut Packing Co.,

"F. E. Barbour."

(299 F.)
"Beech-Nut' Packing Company.

"Canajoharie, N. Y., 6/18/15.
"P. Lorillard Co., Middletown, O.—Dear Sirs: Will you kindly advise if we may expect an early reply to our recent communication with reference to the use of the word 'Beech-Nut' in connection with your new brand of chewing tobacco?

"Yours very truly,                     Beech-Nut Packing Co.,
"F. E. Barbour."

"June 23, 1915.
"Beech-Nut Packing Company, Canajoharie, N. Y.—Dear Sir: Your letters of June 11th and June 18th addressed to this company at Middletown, Ohio, relative to the use by us of the name 'Beech-Nut' for scrap tobacco, have been referred to me.

"Preliminary to any discussion of the matter, will you be good enough to let me know when you first began to use the name 'Beech-Nut'? I notice on your letter head, 'Incorporated 1899,' but this, of course, does not necessarily mean that you began to put products on the market under the name 'Beech-Nut' at that time.

"The statement in your letter of June 11th that you believe we are using the name 'Beech-Nut' with the intention that the public shall be deceived into thinking that our product is of your manufacture, is not only without the slightest warrant, but is little short of ridiculous. As a matter of fact, if such an impression should be formed, it would be to our detriment.

"Yours very truly.
"TSF/L"

"Beech-Nut Packing Company.

"Canajoharie, N. Y., 7/2/15.
"P. Lorillard Co., 119 West 40th St., New York.   Mr. Thomas S. Fuller. Dear Sirs: Your favor of the 23d ult. duly 'rceived.

"Our 'Beech-Nut' trade-mark and trade-name has been used by ourselves and our predecessors since and prior to the year 1891. Both our trade-mark and our trade-name 'Beech-Nut' has been used continuously since that date in our business, and to such an extent and in such manner that both the name and the mark long since came to have a 'secondary significance and meaning'; that is, wherever the mark and name 'Beech-Nut' is seen, and no matter with what product it is associated with, it has a 'secondary significance,' and means only the product and products of the Beech-Nut Packing Company.

"You are woefully mistaken and entirely misinformed in your assumption, and, indeed, your statement that the public is not deceived by your client's use of our trade mark and name 'Beech-Nut.' We know as an absolute truth what is apparent on the face of the facts that the general purchasing public is deceived by your use of our 'Beech-Nut' trade-mark and trade-name and, indeed, this could not well be otherwise, but we know further that your salesmen and agents deliberately push your goods and trade under this identity of use of their mark and name.

"We beg to call your attention in this connection to our former communication to you in this matter and to again urgently request that you immedately stop the use in every way and manner of our trade name and mark 'Beech-Nut' in your business without further action upon our part.

"Yours very truly,                     Beech-Nut Packing Co.,
"F. E. Barbour."

"Beech-Nut Packing Company, Canajoharie, New York. (Attention F. E. Barbour. Esq.) Gentlemen: We have your letter of July 2d, further with reference to our use of the name 'Beech-Nut' on scrap tobacco, and informing us that you and your predecessors have used the name since and prior to the year 1891.

"That the name 'Beech-Nut' has acquired a secondary significance and meaning in the packing industry and is associated in the public mind with goods of your manufacture may be perfectly true, but this would not give

you the right to the name for all purposes. The authorities are overwhelming on this subject. You seem to proceed upon the assumption that we have recently begun to use the name on the tobacco. This is not the case. This company and its predecessor in ownership of this brand have used it continuously since prior to the year 1898, as shown by records in my office. I have not made a search beyond that time, but I have no doubt that I can find that the brand is very much older.

"We would not desire to have it thought that our 'Beech-Nut' tobacco is made by your company, and if you can give us the name of any salesman of ours who has made such a representation, we would be very glad to have it, and we can assure you that if he did make such a representation, his discharge will immediately follow. It could be of no conceivable advantage to us to have the public think that our tobacco product was manufactured by a packing establishment. Our concern has been in business for more than one hundred and fifty years, and in that length of time has built an enviable reputation for the excellence of its tobacco products.

"Though you may turn out an excellent quality of bacon it does not follow that you could turn out an excellent quality of tobacco, or steel rails, or pianos or aeroplanes. If your contention were true, we, who have a brand of tobacco called 'Climax,' could enjoin the use of the name on a well-known threshing machine which is sold in the Western States, or we could enjoin the use of our name on the Lorillard refrigerators. It has never occurred to us to attempt either.

"If you will look at our package of Beech-nut tobacco, you will see that the name 'Lorillard' is prominently displayed thereon. This was done with the desire that people should know the tobacco is coming from the Lorillard Company. It has been our belief that the fact that Lorillard made it would of itself be of value to the brand.

"It is difficult to see how you can seriously claim that there is the slightest similarity in the marking of the package and the fac simile of your mark as displayed on your letter head.

"If you desire me to point out to you authorities which I consider completely sustain my view as expressed herein, I will take pleasure in doing so.

"Yours very truly,

"TSF/L"

"Beech-Nut Packing Company.

"Canajoharie, N. Y., 7/26/15.

"P. Lorillard Co., 119 West 40th St., New York. Thomas S. Fuller. Dear Sirs: Please pardon the delay in acknowledging receipt of your favor of July 8th.

"We will greatly appreciate it if you will send us samples of your product showing the manner of use of the word 'Beech-Nut' since the year 1898, copies of advertisements or of letter heads showing your use of this name. We trust you will consider this a fair request, as we would like to reach a prompt and friendly termination of the correspondence on this subject.

"We also desire to take advantage of the offer contained in the last paragraph of your letter to point out to us the authorities which sustain your views.

"Thanking you in advance for the information requested herein, we remain

"Yours very truly,　　　　　　Beech-Nut Packing Co.,

"F. E. Barbour."

"Beech-Nut Packing Company.

"Canajoharie, N. Y., 9/2/15.

"Mr. Thos. S. Fuller, 119 W. 40th St., New York—Dear Sir: Kindly refer to your favor of July 29th, in which you advised that you would collect the information requested in our letter of July 26th after your return from a week's absence. Up to the present we do not seem to have heard from you and will greatly appreciate the information requested.

"In this connection, we received to-day an inquiry from New River Gro. Co., Hinton, W. Va., asking the best jobbing price on Beech-Nut scrap

tobacco, from which you will note that in the minds of some, at least, Beech-Nut scrap tobacco is credited to the Beech-Nut Packing Company.

"Thanking you to favor us at your early convenience, we remain,

"Yours very truly,     Beech-Nut Packing Co.,

"F. E. Barbour."

"September 15, 1915.

"F. E. Barbour, Esq., Beech-Nut Packing Company, Canajoharie, N. Y.— Dear Sir: I have been able to locate some old price lists which contain our Beech-Nut scrap tobacco, and inclose them herein. I am also sending you an old package showing the use of the name 'Beech-Nut' and our present package.

"Beech-Nut chewing and smoking tobacco (scrap) was made by Harry Weissinger Tobacco Company, of Louisville, Kentucky. This company was bought out by the American Tobacco Company some time in 1903. Prior to the acquisition of the Weissinger Tobacco Company by the American Tobacco Company, the Luhrman & Wilbern Tobacco Company, of Middletown, Ohio, was acquired by the Continental Tobacco Company. In 1904 the American Tobacco Company and the Continental Tobacco Company were merged into a new company formed for that purpose and known as The American Tobacco Company.

"Under a decree of the Circuit Court of the United States for the Southern District of New York, the so-called tobacco combination, which included the American Tobacco Company, was split up. In this disintegration proceeding the Luhrman & Wilbern Tobacco Company, which had always been maintained as a separate entity, was acquired by P. Lorillard Company. In the meantime some of the brands formerly manufactured by the Weissinger Tobacco Company had been taken over and manufactured in the Luhrman & Wilbern factory in Middletown, and after the acquisition by our company of the Luhrman & Wilbern business, including these brands, we continued to operate it as a separate company until about two years ago, when we dissolved it, taking over all of the business and brands directly in our own name.

"I give you this history, so that you may understand the various price lists in the name of Luhrman & Wilbern Tobacco Company and the package in the name of Harry Weissinger Tobacco Company. I do not know the exact date of the old package, as the stamp is not legible, but it was prior to 1903.

"The price lists that I send you are dated January 2, 1904, May 6, 1907, July 1, 1910, and November 3, 1910.

"It is difficult for me to see how any one can claim that there is any similarity in our products and yours or in your label and ours, other than the name 'Beech-Nut.' Your claim that we would not have the right to use the name 'Beech-Nut' on tobacco products must find its basis in the idea that you can appropriate the name 'Beech-Nut' for all products of whatever character.

"That the law does not permit of such a claim is elementary. If your claim were maintainable, then the Lion Brewery in New York could enjoin the manufacture of Lion brand collars, or vice versa. Suppose that the J. B. Williams Company should to-morrow put out a new brand of shaving soap called 'Beech-Nut.' Do you argue that you could stop it because you have first used the name on ham and bacon? It seems to me that your argument must lead to this conclusion. The law of unfair competition, so far as it assumes to protect the public, assumes to protect the purchaser of average intelligence. It is difficult to believe that a person of average intelligence who enters a store for the purpose of buying 'Beech-Nut' hams or bacon could be deceived into thinking he was getting either if he were handed a package of 'Beech-Nut' chewing tobacco, or that the 'Beech-Nut' chewing tobacco was manufactured by the manfacturer of the hams and bacon. It is no more the custom in this country for a packer to manufacture chewing tobacco than it is for a manufacturer of beer to manufacture collars, and the purchaser of average intelligence perfectly well knows this.

"We have tried to make it evident on our package that our 'Beech-Nut' chewing tobacco is of our manufacture, by stamping across the top of the

package, before the name 'Beech-Nut' 'Lorillard's.' We have also on the other side of the package, plainly printed, that it is manufactured at Middletown, Ohio. There is nothing in the get-up of the label, whether in design, color, or wording, which could suggest to a person of average intelligence that it was of your manufacture, or in fact the manufacture of any one except the Lorillard Company.

"As I have written you before, we consider it of immense value to the brand itself that it is manufactured by the Lorillard Company, and we desire the consumers of tobacco to know this, because we believe that the Lorillard name carries with it a vast amount of good will and a guarantee of excellence. We are justified in this belief by reason of the immense increase in the sales of 'Beech-Nut' scrap since we took the former manufacturer's name off and put 'Lorillard's' thereon.

"I think this covers the situation, except with respect to any representations which you claim that some of our salesmen made, to the effect that our 'Beech-Nut' scrap was a product of your company. I have written you before that if you will give me the name of any salesman who has made such representation, and that fact can be determined, his discharge will be immediately forthcoming, as he can be of no service to us. If you will point out to me anything in the conduct of our business which tends to create a belief in the trade that our 'Beech-Nut' scrap is made by you, we will thank you, so that we may rectify it. I assure you that we are just as anxious as you are, if not more so, to prevent any impression that our tobacco is made by you. Will you let me have a copy of the letter you received from the merchant in West Virginia making inquiry of you for 'Beech-Nut' tobacco?

"On this general subject, if you have not already done so, you might consult Nims on Unfair Business Competition, pages 200 to 300. Therein I think you will find a very complete and satisfactory discussion of the law governing this subject. I will quote you paragraph 117 on page 236:

" 'Property in a place name for all purposes cannot exist in one person, under ordinary circumstances. The defendant must be using it in the same or a similar business as the plaintiff. Large amounts of rubber as well as licorice might be found in Anatolia. If there were, the rights which the complainant has acquired in the use of the name in the licorice business, would not prevent another under certain conditions from acquiring a sole right to use the name in the rubber trade.'

"There is no distinction so far as the principle here laid down is concerned between a place name, a generic name, or a fanciful name. You might also consult the cases of Borden's Ice Cream Company v. Borden's Condensed Milk Company, 201 Fed. 510, and Wells v. Ceylon Perfume Company, 105 Fed. 621.

"I apologize for the length of this letter. I desire to give you the facts fully, together with our views, and I sincerely hope that this will satisfy you as to the law and our entire good faith. We are as proud of our good will and the excellence of our products in the tobacco business as you are of yours in the packing industry, and we believe with good reason.

"Yours very truly,                          [Signed]   Thos. S. Fuller."

"Beech-Nut Packing Company.

"Canajoharie, N. Y., 9/20/15.

"Mr. Thos. S. Fuller, 119 West 40th St., New York—Dear Sir: We have your very interesting letter of Sept. 15th, together with the price lists referred to and the package of tobacco.

"Your letter is a very interesting one, and, before giving a definite reply to same, desire to review the matter as presented by you, so that we can give you an intelligent reply.

"At this time, however, we may express our agreement with you that the name Lorillard carriers with it a vast amount of good will and unquestionably a guaranty of excellence. So does the name 'Beech-Nut Packing Co.,' and we take the view that the increase in sales of Beech-Nut scrap tobacco is due to the exploitation of the name 'Beech-Nut' with the oval label, and we cannot help but assume that the general impression is that these goods are manufactured by this company rather than by Lorillard, at least to a

considerable degree, for since writing you last we have another inquiry, and this time from Wm. Edwards Co., of Cleveland, O., asking us to ship them five cases of Beech-Nut scrap tobacco. The previous inquiry came from New River Gro. Co., Hinton, W. Va.

"Yours very truly,                      Beech-Nut Packing Co.,
                                              "F. E. Barbour."

After this correspondence terminated in 1915, no action of any character was taken by the plaintiff as against the defendant. For four years thereafter there was inactivity on the part of the plaintiff, during all of which time the defendant continued to deal in this "Beech-Nut" scrap chewing tobacco on a very large scale.

In 1919 the Lorillard Company planned to put on the market a "Beech-Nut" cigarette, and again there ensued some correspondence between the parties relative to this. (See Correspondence Record, page 15, etc.) Negotiations between the parties relative to the right of the defendant to use "Beech-Nut" as a label for cigarettes terminated without result. Thereafter the Beech-Nut Packing Company decided to apply for registration of "Beech-Nut" for cigarettes, which application was published in the Patent Office Gazette, and the Lorillard Company, upon learning of it, filed a notice of opposition in the Patent Office, where a hearing was had. The proceedings, a copy of which is by stipulation a part of this case, resulted in the denial of the plaintiff's application, from which the plaintiff did not appeal.

In May, 1921, the plaintiff instituted its present cause of action, alleging that the defendant has injured its business good will—has appropriated the good will of the plaintiff to its own uses. One of the defenses interposed is that of estoppel; the following extract from the opinion of Judge Mayer in the case of Valvoline Oil Co. v. Havoline Oil Co. (D. C.) 211 Fed. 189, being called to our attention:

"It cannot be equitable for a well-informed merchant, with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be, and then destroy with the aid of a court decree much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question."

To the point of estoppel the plaintiff replies that the testimony taken in the Patent Office proceedings *first revealed* to it that the defendant had abandoned the "Beechnut" label or trade-mark which was acquired in 1911; that it, from 1915 on, relied on the representation of the defendant as to facts, which were peculiarly within the knowledge of the defendant and inaccessible to it, which upon their face (as furnished by the defendant) gave the defendant the indefeasible right to go on with the "Beech-Nut" scrap tobacco; that the Patent Office proceedings disclosed that there was no continuous use of "Beech-Nut" as a label for tobacco, as the defendant had stated to it in 1915, but that the label "Beechnut" so allotted in 1911 had been abandoned, and that some years thereafter a new trade-mark containing the word "Beech-Nut" was adopted; the facts showing that there was a clear intention on the part of the defendant to abandon the old "Beechnut" label, and to substitute for it one similar to that used by the plaintiff.

[1, 2] Did the defendant abandon "Beechnut" as a label for tobacco by permitting the word to lie dormant for three or four years,

and then reviving it in the manner which has already been described? In considering this question it should be constantly kept in mind that the right to use a word for trade-mark purposes is usually, if not always, confined to "merchandise of the same descriptive properties." The limitation of the scope of trade-marks "to merchandise of the same descriptive properties". (section 5 [b], Trade Mark Act February 20, 1905 [Comp. St. § 9490]) was adopted in the statute as an expression of the scope designated in the decisions of the court under the common law (Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 412–414, 36 Sup. Ct. 357, 60 L. Ed. 713), and the classification of the Patent Office, by which "tobacco products" were placed in class 17 by themselves, is an expression of legal scope by an authority which raises a presumption. Likewise the placing of "foods and ingredients of foods" in a class by themselves, No. 46, raises a presumption that the scope of trade-marks adopted for foods and ingredients of foods is not to extend over other classes. If any cases are to be found which seem to depart from this rule, examination will show either that they involved facts showing actual fraud or bad faith or the equivalent thereof (Peninsular Chem. Co. v. Levinson, 247 Fed. 658, 159 C. C. A. 560), or that the two articles of merchandise are habitually used in conjunction, as was the case of the flour and syrup in Aunt Jemima Co. v. Rigney Co. (C. C. A. 2) 247 Fed. 407, 159 C. C. A. 461, L. R. A. 1918C, 1039, of steam apparatus and steam traps to be used therewith in Simplex v. Gold, 43 App. D. C. 281, of electric lamps and incandescent mantles in Anglo-American Co. v. General Co., 43 App. D. C. 385, and of automobile tires and automobiles in Akron-Overland Tire Co. v. Willys-Overland Co. (C. C. A.) 273 Fed. 674.

In Peninsular Chemical Co. v. Levinson (C. C. A. 6th Cir.) 247 Fed. 658, 159 C. C. A. 560, the court held as stated in the first point of the syllabus:

"Where the certificate of registration of a trade-mark recited that it was used for chemicals, medicines, and pharmaceutical preparations, the trademark did not include cigars, for they cannot be said to be of the same descriptive properties as the specified articles, even though they are usually sold at drug stores."

[3] As we shall see, the fundamental doctrine in this country, as declared by the Supreme Court of the United States in the Hanover Star Milling Company Cases (240 U. S. 403, 412–414, 36 Sup. Ct. 357, 60 L. Ed. 713), and reiterated by that court in the Rectanus Case (248 U. S. 90, 97, 39 Sup. Ct. 48, 63 L. Ed. 141), is that there is no such thing as property in a trade-mark, except as a right appurtenant to the established business or trade in connection with which the mark has been applied, so that a trader has no property in the mark per se, but only in reference to his trade, and cannot prevent another trade from applying this mark to goods which are not of the same description.

Indeed, the books are full of cases illustrating and applying the well-settled doctrine that in this country the same mark may be used by different concerns for different articles, notwithstanding these articles are packaged and sold in the same stores. Examples are:

Candy and breakfast foods. Paul F. Beich Co. v. Kellogg Co., 49 App. D. C. 186, 262 Fed. 640.

Milk and ice cream. Borden Ice Cream Co. v. Borden's Condensed Milk Co. (C. C. A. 7th) 201 Fed. 510, 121 C. C. A. 200; Borden's Condensed Milk Co. v. Eagle Mfg. Co., 47 App. D. C. 191.

Cereals and macaroni. Quaker Oats Co. v. Mother's Macaroni Co., 41 App. D. C. 254.

Cheese and butter. Lawrence v. Sharpless (D. C.) 203 Fed. 762, affirmed (C. C. A. 3d) 208 Fed. 886, 126 C. C. A. 46.

Fountain pens and hair brushes. National Picture Theatres v. Foundation Film Corporation (C. C. A. 2d) 266 Fed. at page 211, note.

Soap and hair tonic, hair dye, perfumery and dentifrice. Barclay v. Caswell Barrie, 5 Trade-Mark Reporter, 86.

These cases are but an application of the broader doctrine that in this country there is no such thing as a universal trade-mark, which would be the practical result of adopting the position taken by plaintiff's counsel; for under modern conditions, for purposes of sanitation, convenience, and attractiveness to the consumer, all sorts of commodities are packaged and sold in the same stores, even over the same counters, regardless of their inherent qualities or conjoint use, as, for instance, handkerchiefs and hairpins, pens and playing cards, razors and rubber goods, candy and candles, soap and soup, tomatoes and tobacco.

Many instances of the use by one concern of a word as a trade-mark for tobacco and the use by a different concern of the same word as a trade-mark for products of a different character have been called to our attention.

There are "Mogul" cigarettes and there are "Mogul" food products, such as evaporated milk, tapioca, sugar, red pepper, almond flavor, and peppermint.

There are "Camel" cigarettes and there are "Camel" food products, such as canned corn, tomato catsup, rolled oats, oysters, ginger, and sweet pickles.

There are "Omar" cigarettes and there are "Omar" food products, such as vanilla, plums, waxed beans, sauer kraut, and coffee.

There is "Star" tobacco and there are "Star" soap and washing fluid.

There are "Sunshine" cigarettes and there are "Sunshine" biscuits.

There are "Polo" cigarettes and there are "Polo" canned goods.

There is "Climax" tobacco and there are "Climax" chocolate dates.

There is "Apple" tobacco and there is "Apple" chewing gum.

It will thus be observed that the distinction between tobacco and food products has for a long time been quite generally recognized.

[4] Next we shall refer to the law of "abandonment." In Baglin v. Cusenier Co., 221 U. S. at pages 597, 598, 31 Sup. Ct. 674 (55 L. Ed. 863), the court said:

"But the loss of the right of property in trade-marks upon the ground of abandonment is not to be viewed as a penalty either for nonuser or for the creation and use of new devices. There must be found an *intent* to abandon, or the property is not lost."

In Saxlehner v. Eisner, 179 U. S. 31, 21 Sup. Ct. 11, 45 L. Ed. 60, the court says:

"To establish the defenses of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon. Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed."

In Browne on Trade-Marks, § 681, it is said:

"A person may temporarily lay aside his mark and resume it without having in the meantime lost his property in the right of user. Abandonment, being in the nature of a forfeiture, must be strictly proved. * * * A defense of abandonment is abhorrent even in an action at law, and the assertion of title on the ground of abandonment by the prior owner must be established by the strongest proof. Mere lapse of time does not per se warrant the conclusion of abandonment. The circumstances of the case, other than mere lapse of time, almost always give complexion to the delay and either excuse or give it a conclusive effect."

And in Hopkins on Trade-Marks (3d Ed.) p. 213, appears the following:

"The length of time during which a trade-mark is not used is, as we have seen, merely a circumstance to be considered with all the other facts in the case in determining whether there was an intention to abandon its use. Thus defendants have been restrained from using a mark that has lain in disuse for periods of one year, three years, four years, nine years, ten years, and even twenty years. The vital question is the intention of the owner of the mark, and the burden of establishing abandonment lies upon the party who affirms it."

In a comparatively recent case of Wallace & Co. v. Repetti, 266 Fed. 307, the Circuit Court of Appeals for the Second Circuit, speaking through Judge Manton, said:

"In order that an abandonment may be established as a defense, it is essential to show, not only acts indicating practical abandonment, but an intent to abandon. Thus, where the appearances may be sufficient to indicate an abandonment, this may be satisfactorily explained by showing a want of intention to relinquish the right claimed. Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60. There is no penalty which inflicts the loss of right of property in trade-marks by nonusage, unless there also be found an intent to abandon." Page 308.

In Monson & Co. v. Boehm, L. R. 26 Ch. D. 398, a leading case here (see Saxlehner v. Eisner, 179 U. S. at page 31, 21 Sup. Ct. 7, 45 L. Ed. 60), as well as in England, the court held as stated in the syllabus:

"In order to deprive a manufacturer of his right to a trade-mark, the use of which has been practically given up for a period of five years, mere discontinuance of user for lack of demand, though coupled with nonregistration and nonassertion of any right, is not enough; there must be evidence of distinct intention to abandon."

In Baglin v. Cusenier Co., supra, the Supreme Court said, as we have seen, that abandonment was not to be viewed as a penalty for the "creation and use of new devices." When the defendant received the list containing these trade-marks, including "Beechnut," in December, 1911, it filed that list with its records. There is undisputed testimony in the case that trade-mark names are valuable—have unlimited values—and so far as appears the only tangible thing received by the defendant at the time was the list of words, including "Beechnut."

That list was not destroyed, but was put away, where it was consulted from time to time.

On three different occasions, at least, the defendant took from this list names for use as labels for tobacco products, to wit, "Comet," "Pioneer," and "Yacht Club." Reviewing the conduct of the defendant, one must conclude, it seems, that it intended to retain all of these listed names, and avail itself of them from time to time as the situation of its business suggested. For three years there was no act on the part of the defendant which would tend to indicate in the slightest degree that the word "Beechnut" had been or was to be abandoned. When it is remembered that there were a thousand or more names on the list, the mere nonusage of one word for that period would not in itself amount to abandonment. So we find that in the fall of 1914 there had been no abandonment of "Beechnut" on the part of the defendant.

The other aspect of the question is whether, in reviving the use of "Beechnut" as a label for its tobacco products, there was effected an abandonment because the defendant in 1914 changed both the old Weissinger formula and the old label in favor of a new kind of tobacco and a different label.

[5] Change of formula has never indicated abandonment. The contrary is the ruling of the courts. In Royal Milling Co. v. J. F. Imbs Milling Co., 44 App. D. C. 207, the Court of Appeals for the District of Columbia says:

"The trade-mark is not to be vitiated by a change in the species of wheat used, any more than it would be vitiated by an important change of process in the making of flour."

In Ball & Gunning Milling Co. v. Mammoth Spring Milling Co., 48 App. D. C. 243 (1918), the Court of Appeals for the District of Columbia, following its earlier ruling in Royal v. Imbs, supra, said:

"Appellant * * * first contends that appellee has abandoned or forfeited its mark because, prior to 1907, it used the mark on its highest grade flour, but about that time produced and sold under another name a better grade of flour. There was no contention in the Patent Office, nor is there here, that the standard or quality of the 'Golden Gate' brand was lowered; in other words, there is no evidence that the 'Golden Gate' brand is not as good to-day as it was when the mark was adopted. These facts bring the case within the ruling of Royal Mill Co. v. J. F. Imbs Mill Co., 44 App D. C. 207, where a mark that had been used on flour made from soft wheat was used on flour made from hard wheat of the same grade, and it was held that there had been no misrepresentation."

The defendant, acquiring the right to use the word "Beechnut" for tobacco purposes, found that the particular formula of tobacco which had been sold for both smoking and chewing purposes by the predecessors who controlled the trade-mark was practically dead. The defendant, under the circumstances, certainly had the right to endeavor to revive this old tobacco, if it could, and it seems to the court that it also had the right to improve it, if it could—improve the tobacco in any way which would make it marketable. Tobacco is tobacco; but there are many, many blends, mixtures, etc. Adopting a new formula, therefore, did not, in the opinion of the court, work an abandonment.

299 F.—54

Next, as to the right of the defendant to change the label: In the case of United Barber's Service Co. v. Cannaliato, 12 Trade-Mark Rep. 265, a case before the Commissioner of Patents for cancellation of a registered trade-mark, "X-Ray," it appeared that the owner and registrant had proven use of the mark since 1914, while the plaintiff or petitioner proved use since 1915. The Commissioner dismissed the petition, holding:

"The fact that the first labels were in manuscript and printed labels were used only from 1918, does not matter, as the use was continuous. Nor does the fact that the printed labels used in 1918 first showed the picture of a woman, though use was claimed since 1913, * * * as the word 'X-Ray' is the essential feature of the mark."

This decision was affirmed by the District of Columbia Court of Appeals in January, 1923. 13 Trade Mark Reporter, 137. In Hier v. Abrahams, 82 N. Y. 519–524 (37 Am. Rep. 589), the court held:

"But, where the trade-mark consists of a word, it may be used by the manufacturer who has appropriated it, in any style of print, or on any form of label, and its use by another in any form is unlawful. * * * The trade-mark consisted in the word simply, and the plaintiffs might have printed it on any form of label they might fancy, without losing the protection of the law."

Hopkins on Trade-Marks (3d Ed.) p. 214, says:

"The adoption of a new label or brand is, of course, an abandonment of all the distinctive features of the old label or brand not preserved in the new one."

In the instant case the defendant did not actually copy the plaintiff's trade-mark. We do not think it is contended that the defendant used an exact reproduction of the plaintiff's oval or colors. If it did, the question involved might be quite different. An examination of them will demonstrate that they do not resemble each other closely.

There is nothing in the record to indicate that the old Weissinger squirrel label was attractive to any purchaser, either because of its color or design. Whatever sales were effected do not appear to have been effected because of the label. Although it carried the picture of a squirrel, the tobacco was always referred to, so far as we are aware, as "Beechnut," and not otherwise. There does not appear to be any particular reason why a squirrel should appear under the word "Beechnut" rather than the picture of a beechnut. The old formula was not to be dealt in any longer, and it seems to us that the change in the formula justified a change in the decorative features of the package which was to contain this new blend or mixture. So the label was modernized, made attractive. Is it not common knowledge that many old standard tobaccos are now ornamented considerably differently than they were years ago? Boxes, containers, and packages for tobacco have undergone many improvements during the past 20 years. To hold that the rightful owner of an established trade-name may not redecorate or reornament, or, to use a somewhat inelegant phrase, polish it up, would be, in our opinion, unreasonable.

So the defendant, availing itself of the right to redecorate and reornament its label, adopted as the main change, as a comparison will promptly disclose, what has been called a sunburst or radiating effect.

Nothing like this sunburst or radiating effect appears on the labels of the plaintiff, and the fact that the defendant adopted it demonstrates conclusively, it seems, that there was no attempt on the part of the defendant to copy or imitate the standard mark of the plaintiff. Not only was there a sunburst or radiating effect placed upon this new label, which, by the way, overshadows most of the other features of it, but, instead of there being three colored photographs of a beechnut, the defendant placed the red outline of one in an inverted position. The plaintiff argues that the two trade-marks are so similar that the public thinks that they are the same. If one should eliminate the word "Beech-Nut" from both labels, it would be extremely difficult to locate any similarity at all between them. And each party has the right to the word "Beech-Nut" for its distinct product. It may be that what the defendant did in changing the old Weissinger label has amounted to an abandonment of the squirrel and other decorative features of that old label, which have been omitted from the revised label; but the court is unable to agree that the word "Beech-Nut" was abandoned simply because a hyphen was utilized in addition to the adoption of different decorative features, the main feature of which is a sunburst or radiating effect, unknown to any label of the plaintiff which has been called to our attention.

What we have said relative to the defendant's right to use the word "Beech-Nut" in connection with tobacco applies also to the cigarette feature of this cause. Cigarettes contain tobacco and are smoked. The trade-mark acquired by the defendant was for smoking and chewing tobacco, and, as we have already pointed out, it is our opinion that the blend or formulas could be changed, and the labels could be redecorated, without effecting an abandonment of the word.

There being no abandonment on the part of the defendant, the bill should be dismissed.