## AUTOLINE OIL CO. et al. v. INDIAN REFINING CO., Inc.

(District Court, D. Maryland. December 30, 1924.)

### No. 351.

**1. Trade-marks and trade-names and unfair competition ⬅️3(5)—Mark denoting grade or quality not valid trade-mark.**

A mark or symbol, used primarily to denote grade or quality and not origin, cannot become a valid trade-mark.

**2. Trade-marks and trade-names and unfair competition ⬅️45—Registration raises strong presumption of validity.**

The allowance of a trade-mark by the Patent Office furnishes a strong presumption of its validity.

**3. Trade-marks and trade-names and unfair competition ⬅️55—Wrongful intent not essential to infringement of registered trade-mark.**

In a suit for violation of a properly registered trade-mark, it is not necessary to show wrongful intent or facts justifying an inference of such intent.

**4. Trade-marks and trade-names and unfair competition ⬅️6—Letters may constitute valid trade-mark.**

Letters or initials in combination, and in some cases a single letter, if used by a manufacturer to designate the goods he manufactures and to distinguish them from those made by another, may constitute a valid trade-mark.

**5. Trade-marks and trade-names and unfair competition ⬅️6—A trade-mark held invalid as indicating grade or quality and not origin.**

Complainant for several years manufactured and sold lubricating oils for automobiles under the trade-mark "Autoline," which it registered. Later it compounded a nonchatter oil, especially adapted for Ford cars, which it sold at first under the name "Ford Autoline," and later "F Autoline." It registered as a trade-mark a symbol consisting of the letter "F," in connection with the words "Autoline" and "For Ford Cars." In its advertising it printed lists in which it recommended F. Autoline for Ford

cars, and each of several other grades, designated by numerals for different makes of car. *Held* that the letter "F" as so used designated the kind or grade of oil and not origin, and was invalid as a trade-mark.

**6. Trade-marks and trade-names and unfair competition ⬅️32—Trade-mark is abandoned by its use as a grade mark.**

The use of an established trade-mark on a new product as a grade mark is an abandonment of the symbol as a trade-mark, and justifies its use in the same way by any one else.

**7. Trade-marks and trade-names and unfair competition ⬅️68—"Unfair competition" defined.**

Nothing else than conduct tending to pass off one man's merchandise or business as that of another will constitute "unfair competition."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

**8. Trade-marks and trade-names and unfair competition ⬅️93(3) — Unfair competition held not established.**

Evidence *held* insufficient to establish unfair competition, in the use of the letter "F" in sale of oil for Ford cars.

In Equity. Suit by the Autoline Oil Company and the Wm. C. Robinson & Son Company against the Indian Refining Company, Inc. Decree for defendant.

John E. Cross, Albert E. Donaldson, and Jesse N. Bowen, all of Baltimore, Md., for complainants.

Bartlett & Brownell, of New York City, and Haman, Cook, Chesnut & Markell, of Baltimore, Md., for defendant.

SOPER, District Judge. The bill of complaint alleges the infringment by the defendant of two registered trade-marks belonging to the complainant Wm. C. Robinson & Son Company, and also acts of unfair competition, and prays for an injunction, for an accounting of profits, and for other relief. The first trade-mark consists of the letter "F" inclosed within the outline of a diamond-shaped figure as a trademark for engine and machine oils. The second trade-mark consists of the letter "F" somewhat ornamental in design, but unaccompanied by the diamond-shaped figure as a trade mark for lubricating oils. There are two complainants. Wm. C. Robinson & Son Company, hereinafter called the Robinson Company, was incorporated in 1901. It operates a plant for the blending of oils in Baltimore, and is the successor in business of the former copartnership known as Wm. C. Robinson & Son, long established in that city. When the automobile business became

active, it adopted the name "Autoline Oil Company," which it advertised as the "automotive oil sales' department" of its business. In 1924 the Autoline Oil Company was incorporated and acquired all of the stock of the Robinson Company. When the complainant is referred to in this opinion, the latter company is meant.

In the year 1887 the firm, which preceded the corporations, adopted and used the diamond "F" as a trade-mark' for engine and machine oils, and in 1914, upon the application of the Robinson Company, the trade-mark was duly registered. At this time the principal business of the company was the distribution and sale of general lubricating oils to industrial plants, mills, machine shops, etc. "Diamond F" engine and machine oils became known to the oil trade in the northern, eastern, and southern states, and as far west as Chicago, and the trade-mark indicated to the trade in this territory not only an engine or machine oil, but one manufactured by the Robinson Company. This product became an important part of the business, and amounted to 30 per cent. of the output. Business conditions became somewhat unfavorable during the World War, so that "Diamond F" machine and engine oils were not so easily marketed as in previous years, but the product still remained the best seller of the complainant's oils of this description.

The trade-mark "F," unaccompanied by the diamond-shaped figure, is of more recent origin. It was registered in the Patent Office on February 20, 1923. The Robinson Company, in the meantime, had embarked upon the business of the blending and sale of lubricating oils for internal combustion engines and automobiles. These oils it sold under the trade name "Autoline," which, upon the company's application, was duly registered in the Patent Office on November 7, 1905. The trade-mark was adopted as an arbitrary word indicating the origin of the oils, and has been continuously used by the Robinson Company in connection with the sale and distribution of its automobile lubricants.

For some eighteen months prior to January 1, 1922, the Robinson Company was endeavoring to discover a lubricating oil especially adapted to Ford automobiles. It was common experience that because of the construction of the Ford car ordinary lubricating oils, suitable for other automobiles, were not entirely satisfactory for Fords. The foot or service brake on a Ford car operates upon the transmission, which is of the planetary type. Leather bands surround and contract upon a drum in the transmission when the brake is applied. It was found that in the use of lubricants generally employed the bands acquired a hard, glazed surface so that when the brake was applied and the bands were contracted they would alternately slip and hold in contact with the drum; and a more or less violent vibration of the transmission and of the whole car would ensue. This vibration was known as chattering, and the problem to which the complainant, as well as others in the oil trade, devoted themselves was the discovery of a nonchatter oil.

In the latter part of 1921 the Robinson Company perfected a nonchatter oil at its Baltimore plant by combining with a petroleum base a small percentage of animal oil known as degras, consisting of refined wool grease. In December of that year samples were furnished to local Ford dealers and repair shops, and found to be satisfactory. When the new oil was used, the transmission bands were kept soft and pliable so that too sudden gripping was avoided. In January, 1922, the Robinson Company began to advertise the new oil. It adopted the name "Ford Autoline" to distinguish the product from other kinds of Autoline which it was advertising for automobiles of other makes, and to indicate to Ford owners that it was especially suitable to their cars. The advertisements took the form of articles in the Baltimore newspapers, of circulars or broadsides sent to Ford dealers in the eastern half of the United States, and of other advertising devices which were sent to owners of Ford cars.

The interest of Ford dealers and owners was elicited, and the Robinson Company determined upon a campaign of national advertising. On January 22, 1922, an extended conference was held between officers, employees, and advertising men to determine finally upon the name of the new oil and the details of advertisement. It was decided to abandon the name "Ford Autoline" for fear that its use might infringe upon the rights of Henry Ford, since the name would probably be understood as indicating an oil manufactured by Ford. See Ford Motor Co. v. Wilson (D. C.) 223 F. 808. Nevertheless the Robinson Company was greatly desirous of adopting a mark that would attract the attention of Ford owners and dealers. Indeed the importance of the venture rested largely upon the fact that approximately

one-half of the automobiles used in the United States were Fords, whose needs the company wished to supply. Finally it was determined to call the oil "F Autoline," because the letter "F" could be so used as to indicate readily that the oil was suitable for the lubrication of Ford cars. This was the primary reason for the adoption of the symbol. Another reason which occurred to the company at the time was the fact that for many years past it had used the "Diamond F" trade-mark upon engine and machine oils.

Having decided upon the name of the lubricant, the Robinson Company incurred great expense to make known to the trade that it had an oil suitable for Ford cars, and that the name of the oil was "F Autoline." During the year 1922 $77,000 was spent for advertising. A page advertisement was inserted in the Literary Digest of February 4, 1922, and later in the Saturday Evening Post and other magazines. Advertisements were inserted in newspapers in 100 cities and towns throughout the United States. Telegrams were sent to some 5,000 Ford dealers in various part of the country. Circulars and broadsides were published and widely distributed. The Robinson Company also spent $35,000 in 1923 and $34,000 for nine months in 1924 chiefly in advertising "F Autoline."

The merits of the new oil and the advertisement thereof created a demand which grew steadily until it reached its peak in May, 1922. On June 30, 1922, application was made to the Patent Office for the registration of the trade-mark. It indicated that a symbol consisting of the letter "F," somewhat ornamented and embellished, was to be attached to packages containing lubricating oil. The samples of the trade-mark furnished showed that the letter "F" was used in connection with the word "Autoline," the registered trade-mark of the Robinson Company, and also in connection with the words "for Ford cars." Registration was finally granted on February 20, 1923. Patents for the oil were granted in 1922 and 1923, but no charge of their infringement is made in this case.

Both before and after January 1, 1922, it had been the custom of manufacturers and distributors of oils to use letters and numbers to indicate the grades or kinds of oil sold. The purpose of those who sought the automobile trade was to emphasize a trade-name which indicated the origin of the product, as for instance, Autoline, in the case of the Robinson Company; Polarine in the case of certain of the Standard Oil Companies, and Havoline, in the case of the defendant, the Indian Refining Company. These names the manufacturers endeavored to advertise widely, the grade marks being associated therewith to enable the dealers and customers to follow the more easily the recommendations of manufacturers of the appropriate grade of oil for particular makes of automobiles. It is conceded that there was no letter of the alphabet that was not so appropriated and used. As a matter of fact, the Robinson Company themselves used the symbol "FF" as a grade mark on cup greases, manufactured for the lubrication of automobiles, and at one stage of its national advertising campaign made use of the letter "F" in connection with the word "Tractorlene" to indicate the proper kind of lubricant to be used upon Ford tractors. Prior to the discovery of the "F" oil the grade recommended by the complainant for Ford tractors had been known as "C Tractorlene." The letter "F," although not customarily used to indicate an automobile oil prior to the transactions covered by this case, has been used in the petroleum business as a grade mark for oils suitable for other purposes but its use seems to have been limited to wholesale transactions between refiners and jobbers.

Prior to the discovery of the Ford oil it had been the custom of the Robinson Company, and of other manufacturers of lubricants for automobiles, to issue lists or charts containing the names of most of the automobiles used in the United States, with recommendations of the character, grade, or kind of oil to be used on the different kinds of cars. These lists were distributed to customers and dealers. The Robinson Company manufactured six different grades or kinds of Autoline which were respectively designated as 00, 23, 2, 4, 6, and 8. Packages containing the various kinds of Autoline were marked with the symbol for the grade contained therein. 00 Autoline was specially recommended for Franklin cars; 2 Autoline for Ford cars, etc. When the complainant placed on the market the new oil for Fords, its charts or circulars were changed so as to indicate that "F Autoline" was the proper grade or kind of oil for Fords, instead of "2 Autoline" previously recommended.

Autoline was sold both before and after the adoption of the new oil in a small amount, approximating 2 per cent. of the total output, in one or five gallon cans, bear-

ing on the face lithographs displaying the word "Autoline," the letter or number indicating the grade, and the name and address of Wm. C. Robinson & Son Company. The grade letter was not lithographed upon the can. As in the case of other dealers, a space or panel on the can beneath the name of the oil, e. g., "Autoline," was left blank, in which the manufacturer stamped the letter or figure indicating the character of the contents. The full-page advertisements of "F Autoline" in magazines of national distribution contained pictures of the one-gallon can in which the letter "F" appeared in the grade panel. The larger part of the oils were distributed in drums or barrels on the head of which the name of the oil was marked. Since most retail customers did not buy in packages, but only by the quart, they were not likely to see in a retail dealer's place the packages containing the oil. In order to attract their attention, signs of considerable size were distributed to be displayed by the dealers. The signs of "F Autoline" which were first put out by the complainant contained the letter "F" and the word "Autoline" arranged in substantially the same way as the lithographs upon the cans; that is to say, that, while the letter "F" was plainly visible, it was not emphasized to the same extent as the word "Autoline."

The national advertising campaign of the Robinson Company naturally attracted the attention of other dealers in petroleum products. One of them was the defendant in this case. It is a New York corporation, with its main office in New York City, and a refinery in Lawrenceville, Ind., capable of producing 15,000 to 20,000 barrels of oil per day. See Valvoline Oil Co. v. Havoline Oil Co. (D. C.) 211 F. 189. It conducted a large business in oils throughout the United States amounting approximately to $20,000,000 per year, and marketed its automobile lubricants under the trade-name of "Havoline," using various letters and numbers to indicate the different grades. It has been an advertiser on a national scale since 1914. The Literary Digest advertisement of the Robinson Company of February 4, 1923, came to its attention. It also learned of other nonchatter oils which were on the market, notably the Warco Nonchatter Oil and Doublene. In March or April of 1922 it caused samples of these oils to be analyzed, and shortly thereafter devised a product of its own for the same purpose. It recognized the advantages of putting a Ford

oil upon the market in competition with complainant's "F Autoline," and also that the letter "F" employed in connection with the words "for Ford cars" was an advertising device of value. Accordingly the defendant named its Ford oil "Havoline F." There is some evidence tending to show that the letter "F" was adopted by the defendant independently of the action of the Robinson Company, but the latter's use of the letter "F" was first begun and its advertisements had come to the attention of the defendant before it entered the field.

When the defendant advertised its own Ford oil, it called especial attention to the suitability of the oil for Ford cars. Magazines of nation wide circulation carried the advertisements, and there were also newspaper advertisements of considerable variety and number, as well as circulars and signs for display in garages and machine shops. $77,000 was spent for Havoline advertisements generally in 1921; $199,000 in 1922; and $234,000 in 1923; and $247,000 in the first nine months of 1924. The proportion of the sums so expended devoted to "Havoline F" was not ascertained, but it was considerable in amount.

The results were soon manifest in the Robinson Company's business. While the sales of "F Autoline" continued to be large, and presumably profitable, and have so continued until the present time, amounting approximately to 35 per cent. of the Robinson Company's entire business, they did not continue to grow and increase as they bid fair to do before the defendant began its operations. Notice of the defendant's activity came to the officers of the Robinson Company in April, and the extent of the defendant's activity was known to all by a page advertisement in the Saturday Evening Post of June 9, 1922. It was followed by extensive publications throughout the year. There was no protest, however, on the part of the Robinson Company. It applied for the trade-mark "F" on June 30, 1922, but did not notify the defendant of infringement until March 1, 1923, a short time after the registration of its trade-mark, which took place February 20, 1923.

Almost from the beginning of its campaign in April, 1922, the defendant especially emphasized the "F" by its size and manner of display in connection with the word "Havoline." In no case was the letter "F" used alone, and it would have been wellnigh impossible for any one to read the advertisements without perceiving that the

product advertised was a Havoline Oil. The Robinson Company, not to be outdone, increased the size of the letter "F" in its advertisements from time to time, until it became a very significant feature, but in its case also the letter was invariably employed in conjunction with its general trade-mark for automobile oils, "Autoline." The enlarged "F" was unquestionably used by both parties to attract the trade of Ford owners and dealers, and, as it was always associated with the words "for Fords" or "for Ford cars," it speedily acquired the significance of a suitable oil for that make of automobile.

The Robinson Company was not the first concern to put out a Ford oil which proved to be permanently marketable. The Warren Refining & Chemical Company of Cleveland, Ohio, advertised and sold such a product throughout the year 1921. Nor was the Robinson Company the first to advertise an oil especially suitable for Ford cars, or indeed to employ the letter "F" in this connection. There were scattering instances in which similar products had been called "Ford" oil prior to January, 1922, and there was one case in which the letter "F" had been occasionally used in New York City as an abbreviation of the word "Ford," but its use was not long continued. There can be no doubt, however, that the complainant was the first to advertise a successful Ford oil on a national scale, and the first to adopt the letter "F" prominently as an advertising symbol of the goods. It is also beyond doubt that, had the complainant been able to maintain the exclusive use of the letter "F" as a symbol, indicating to Ford owners and dealers that its product was suitable for Ford cars, it would have had a very considerable advantage over other competitors.

The actual event was quite different. Not only did the defendant adopt a similar advertising device, but other manufacturers, noting the success of these ventures in the production of Ford oils, put lubricants of a similar character upon the market, and employed the letter "F" as a grade mark indicating a Ford oil, with the result that at the time of the trial there were on the market not only "F Autoline" and "Havoline F," but "Polarine F," the product of the Standard Oil Company of Indiana and of the Standard Oil Company of Ohio; "Warco F," of the Warren Refining and Chemical Company; and "Zeroline F," of the Standard Oil Company of California. In most of their advertisements a tendency to

exaggerate the letter "F" is noticeable. It is fair to say that at this writing the letter has become firmly established in the oil trade as a symbol or advertising device for lubricating oils for Ford cars.

[1] The crucial question in the case is whether the trade-mark "F" was adopted by the complainant as indicative of origin or descriptive of quality. The case of Mfg. Co. v. Trainer, 101 U. S. 51, 25 L. Ed. 993, is most pertinent. The Amoskeag Mfg. Co. manufactured ticking, and marked its products with labels containing the name of the company, and certain letters, A, B, C, or D, indicating the grade of excellence of the goods. Later it introduced a better grade, adopting for it, the letters "A. C. A." being a combination of the initials of its name, "Amoskeag Company," and the letter by which it formerly indicated the first grade. Subsequently the defendant, a manufacturer of similar goods, made use of the same letters, "A. C. A." as a grade mark for its goods, by which it designated ticking of a particular quality. It was held that the trade-mark was not valid because it was adopted by the plaintiffs to indicate the quality of the goods manufactured, and not their origin. The court said:

"The object of the trade-mark is to indicate * * * the origin or ownership of the article to which it is applied. If it did not, it would serve no useful purpose either to the manufacturer or to the public; it would afford no protection to either against the sale of a spurious in place of the genuine article. * * * No one can claim protection for the exclusive use of a trade-mark * * * which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured, rather than protected, for competition would be destroyed. Nor can a generic name or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to legal protection. * * *

"The owner of an original trade-mark has an undoubted right to be protected in the exclusive use of all the marks, forms, or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to the exclusive use of any words, letters, figures, or symbols which have no relation to the origin or ownership of the goods, but are only meant to in-

dicate their names or quality. He has no right to appropriate a sign or symbol, which from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose."

In the case of Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, at page 547, 11 S. Ct. 396, 400 (34 L. Ed. 997), it is said:

"Nothing is better settled than that an exclusive right to the use of words, letters or symbols, to indicate merely the quality of the goods to which they are affixed, cannot be acquired. And while if the primary object of the mark be to indicate origin or ownership, the mere fact that the article has obtained such a wide sale that it has also become indicative of quality is not of itself sufficient to debar the owner from protection, and make it the common property of the trade (Burton v. Stratton, 12 Fed. Rep. 696), yet, if the device or symbol was not adopted for the purpose of indicating origin, manufacture, or ownership, but was placed upon the article to denote class, grade, style, or quality, it cannot be upheld as technically a trade-mark."

In the case of Columbia Mill Co. v. Alcorn, 150 U. S. 460, at page 463, 14 S. Ct. 151, 152 (37 L. Ed. 1144), it is said:

"To acquire the right to the exclusive use of a name, device, or symbol, as a trade-mark, it must appear that it was adopted for the purpose of indentifying the origin or ownership of the article to which it is attached, or that such trade-mark must point distinctively, either by itself or by association, to the origin, manufacture, or ownership of the article on which it is stamped. It must be designed, as its primary object and purpose, to indicate the owner or producer of the commodity, and to distinguish it from like articles manufactured by others. * * * If the * * * symbol was adopted or placed upon the article for the purpose of identifying its class, grade, style, or quality, or for any purpose other than a reference to or indication of its ownership, it cannot be sustained as a valid trade-mark."

See, also, Beadleston & Woerz v. Cooke Brewing Co., 74 F. 229, 20 C. C. A. 405; Vacuum Oil Co. v. Climax Refining Co., 120 F. 254, 56 C. C. A. 90; Stevens Linen Works v. Wm. & John Don & Co. (C. C.) 121 F. 171; Affirmed in 127 F. 950, 62 C. C. A. 582; Dennison Mfg. Co. v. Scharf Tag Label & Box Co., 135 F. 625, 68 C. C.

A. 263; Touraine Co. v. Washburn Co., 286 F. 1020, 52 App. D. C. 356; Horlick's Malted Milk Co. v. Borden Co., 295 F. 233, 54 App. D. C. 91.

[2-4] The effect of the Trade-Mark Act of February 20, 1905 (33 Stat. § 24), should be considered. Section 16 provides that the registration of a trade-mark under the provisions of the act shall be prima facie evidence of ownership, and any person who shall, without the consent of the owner, reproduce or colorably imitate any such trade-mark shall be liable to an action for damages therefor at the suit of the owner. Section 19 provides that courts having jurisdiction of cases under the act shall have power to grant injunctions to prevent the violation of any right of the owner of a registered trade-mark on such terms as the court may deem reasonable. The allowance of a trade-mark by the Patent Office furnishes a strong presumption of its validity (Chapin-Sachs Mfg. Co. v. Hendler Creamery Co., 254 F. 553, 166 C. C. A. 111), and in a case for violation of a properly registered trade-mark it is not necessary to show wrongful intent or facts justifying an inference of such intent. Thaddeus Davids Co. v. Davids Mfg. Co., 233 U. S. 461, 34 S. Ct. 648, 58 L. Ed. 1046, Ann. Cas. 1915B, 322. It is also settled that letters or initials in combination may be adopted and placed upon an article in such a way as to indicate the origin or manufacturer of the goods, and therefore constitute a valid trade-mark. Giron v. Gartner (C. C.) 47 F. 467; Godillot v. American Grocery Co. (C. C.) 71 F. 873; Van Hoboken et al. v. Mohns (C. C.) 112 F. 528; General Electric Co. v. Re-New Lamp Co. (C. C.) 128 F. 154; American Tin Plate Co. v. Licking Roller Mill Co. (C. C.) 158 F. 690; Planten v. Gedney, 224 F. 382, 140 C. C. A. 68. Indeed, there is authority for the proposition that a single letter, if adopted and used by a manufacturer in order to designate the goods he manufactures, and to distinguish them from those made by another, may form the subject of a valid trade-mark. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Rosenblum v. Rosenblum (D. C.) 253 F. 863. But the rule is applied with caution when, in the custom of the particular trade, letters or numerals are generally employed to indicate the grade or quality of the goods. Mfg. Co. v. Trainer, 101 U. S. 51, 25 L. Ed. 993; Coats v. Merrick Thread Co., 149 U. S. 562, 13 S. Ct. 966, 37 L. Ed. 847; Humphreys' Homeopathic Medicine Co. v. Hilton (C. C.)

60 F. 756; Dennison Mfg. Co. v. Thomas Mfg. Co. (C. C.) 94 F. 651.

[5] In the case at bar the adoption of the trade-mark "F" is so recent, and the surrounding facts so very clear, that the conclusion may be drawn with certainty that the trade-mark was adopted primarily as a symbol indicating the quality or characteristics of the goods, and only secondarily, if at all, to indicate their origin. The facts leading to this conclusion have already been set out in detail, but they may be summarized as follows: Initial use of the phrase "Ford Autoline"; its contraction or abridgment to "F Autoline for Fords" in order to avoid litigation with Henry Ford; the publication of charts by the complainant designating the kinds of Autoline to be used for various automobiles which gave the advice prior to the discovery of the Ford oil to use "Autoline 2" for Fords, and subsequent to the discovery, to use "F Autoline" for Fords; the use of the letter "F" in connection with Tractorlene to indicate the proper lubricant for Ford tractors; the fact that the letter "F" was never used alone but always in connection with the word "Autoline" and complainant's name and address, and was not used at all in connection with "Autoline" for other grades of oil, as to which other grade marks were used; the use of the letter "F" in the grade panels on the one and five gallon cans of "Autoline," and display of pictures on the can as part of page advertisements in national magazines having a circulation in the millions; finally, the general use of letters and figures in the oil trade to indicate grades or kinds of oil of various manufacturers. All these circumstances combined show beyond doubt that the primary purpose of the adoption and use by the complainant of the letter "F" was not to indicate the origin of the goods, but to advertise them as suitable for Ford cars. The origin of the goods was indicated by the trade-mark "Autoline" and the Robinson name and address. The circumstance that for other sorts of oil the complainant had previously used the trade-mark "Diamond F" may have contributed in some measure to the adoption of the "F," but it is safe to say that the similarity was a matter of coincidence and not of choice.

It follows that the validity of the trade-mark "F" must be denied, for, as stated in Paul on Trade-Marks, pp. 105, 106:

"It is settled by competent authority that a manufacturer or dealer may appropriate different trade-marks for different grades of goods of the same general kind, or different species of goods of the same genus. Each case is to be decided by considering the primary function of the mark adopted. If the primary function is to denote origin or ownership, and the mark is distinctive, it is a valid trade-mark. If the primary function is to indicate grade or quality, the mark is invalid for the purpose of a trade-mark."

[6] The complainant contends, however, that whatever may be said of the validity of its trade-mark "F" there can be no question in this respect as to its trade-mark "Diamond F." Not only has it been used since 1887, but it is protected by registration under the act of February 20, 1905, and particularly section 5, which permits the registration of any mark employed by the applicant in active and exclusive use as a trade-mark for ten years preceding February 20, 1905, even though it be a descriptive mark. The complainant points out that the trade-mark "Diamond F" may be infringed not only by a precisely similar mark, but, as provided in section 16 of the act, by a colorable imitation, such as "F" without the diamond, and not only by the use of the mark upon goods of the same character, but also upon goods of substantially the same descriptive properties. It is urged, therefore, that the use of the letter "F" as a trade-mark on automobile oils is at least a colorable imitation and infringement of the trade-mark "Diamond" as used upon oils for the lubrication of machines and engines.

It would seem that the complainant did not regard the letter "F" as identical with "F" in a diamond-shaped figure, for an additional registration was secured. However this may be, the same purpose did not underlie both marks. It is certain from the history that primarily "Diamond F" was a mark of origin, while "F" was a mark of description. Therefore even if the marks are so similar as to be substantially the same in appearance, it is pertinent to inquire whether one may use an established trade-mark upon a new product as a grade mark and at the same time retain the exclusive right to the symbol. It must be remembered that use of a trade-mark is essential to its validity. The right of ownership is not a mere abstract right, as in the case of a patent, which may exist apart from the business in which it is used (Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581), but ownership is acquired and retained only by appropriation and use, and may be lost by abandonment. Trade-Mark Cases, 100 U. S. 82, 25

L. Ed. 550; Levy v. Waitt, 61 F. 1008, 10 C. C. A. 227, 25 L. R. A. 190; American Washboard Co. v. Saginaw Mfg. Co., 103 F. 291, 43 C. C. A. 233, 50 L. R. A. 609; Stephano Bros. v. Stamatopoulos, 238 F. 89, 151 C. C. A. 165, L. R. A. 1917C, 1157; Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713; Parlett v. Guggenheimer, 67 Md. 542, 10 A. 81, 1 Am. St. Rep. 416.

If it be considered that the use of the letter "F" in the expression "F Autoline" was in effect an application of the complainant's old trade-mark, its employment in this connection for purposes of description was so much of an abandonment of the symbol as a trade-mark as to justify its use in the same way by any one else. This is in fact what the defendant did. "Havoline F" indicated a grade of defendant's goods, and the symbol "F" did not signify either origin or manufacture. The complainant may not prohibit the use of the mark by others on the ground that it is a trade-mark lawfully acquired by continuous and exclusive use, and at the same time employ it in a descriptive sense in an attempt to monopolize the trade in a particular kind of goods.

[7] Finally, the complainant contends that it is entitled to relief, even though it may not rely upon either of its trade-marks because the defendant has been guilty of acts of unfair competition, of which the court has jurisdiction by reason of diversity of citizenship. The cardinal rule is that nothing else than conduct tending to pass off one man's merchandise or business as that of another, will constitute unfair competition. Rathbone v. Champion Steel Range Co., 189 F. 26, 110 C. C. A. 596, 37 L. R. A. (N. S.) 258; American Washboard Co. v. Saginaw Mfg. Co., 103 F. 281, 43 C. C. A. 233, 50 L. R. A. 609; Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713; Hendler Creamery Co. v. Chapin-Sachs Mfg. Co., 254 F. 553, 166 C. C. A. 111.

[8] The evidence does not bear out the contention that there was an attempt on the part of the defendant to palm off its goods as those of the complainant, or that the acts of the defendant tended to produce such result. It has already been noticed that neither the complainant nor the defendant made use of the symbol "F" in the sale and dis-

tribution of Ford oils unaccompanied by its general mark for automobile oils. In every instance the letter was associated with the word "Autoline" for the complainant's goods and with the word "Havoline" for the defendant's goods. There was, it is true, an unusual and significant exaggeration of the letter "F" considered as a grade mark in comparison with the remainder of the advertisement with which it was associated. Nevertheless the accompanying names were always prominently displayed, and it would have been extremely difficult for any customer to have overlooked the general name by reason of the prominence of the letter or to have been misled into the purchase of the "F" oil of the defendant when he intended to purchase the "F" oil of the complainant.

There is indeed testimony in the case introduced by the complainant to show that its Ford oil had become known to the trade as "F" oil, indicating not only an oil suitable for Fords, but one manufactured or blended by the Robinson Company. The testimony was given by a number of retail dealers in Baltimore city, who handled Autoline products in their place of business. Each displayed a sign of conspicuous design and size advertising "F Autoline" oil; the letter "F" being shown with special prominence. They testified in effect that drivers of Ford cars, who were regular customers, very frequently asked for "F" oil, although sometimes such customers asked for "Ford" oil or "F Autoline." The period of time to which the testimony relates is not made perfectly clear, but apparently the witnesses were testifying to the situation as it existed at the time of the trial. This testimony falls far short of the requirements. It must be borne in mind that both parties were endeavoring to make known to the public that a suitable Ford oil could be had. For this purpose the letter "F" was well suited as an advertising symbol. Both parties took unusual pains to impress it upon the trade, and when their example was followed by other manufacturers the symbol achieved a significance which it would now be difficult to destroy, and "F" oils became known not as the oils of a particular manufacturer, but as oils suitable for Fords. A case of unfair competition is not made out.

The bill of complaint will be dismissed.