**PENNZOIL CO. et al. v. CROWN CENTRAL PETROLEUM CORPORATION.**

**Civil Action No. 1293.**

District Court, D. Maryland.

July 15, 1943.

John S. Powers, of Buffalo, N. Y., Southgate L. Morison and Ritchie, Janney, Ober & Williams, all of Baltimore, and Joseph W. Milburn, of Washington, D. C., for plaintiffs.

Karl F. Steinman and Edwin H. Brownley, both of Baltimore, Md., and Edward G. Fenwick, of Washington, D. C., for defendant.

CHESNUT, District Judge.

In this case the plaintiffs seek an injunction and accounting for profits and damages from the defendant for alleged infringement of a federally registered trade-mark and for related unfair competition. The defenses are (1) that the plaintiffs' trade-mark is invalid because descriptive; (2) the defendant's mark is not an infringement by colorable imitation or otherwise; (3) that there was no unfair competition either actual or constructive and (4) laches.

The evidence has been presented, on the part of the plaintiffs, primarily by depositions of many trade witnesses and including the testimony of some of the defendant's officers or agents taken for purpose of discovery. Evidence on behalf of the defendant, in addition to the testimony of its officers taken by deposition, has been principally by examination of witnesses in court. Numerous exhibits have been filed by the parties respectively. The principal facts developed in the evidence are—

1. The plaintiffs are The Pennzoil Company (of Pennsylvania) and its subsidiary The Pennzoil Company (of California). They, and their predecessors, have for many years been engaged in refining and marketing motor lubricating oils, principally for automobiles. They refine and sell a type of lubricating oil known as Pennsylvania Oils, which emanate from wells in the Appalachian strip running from southwestern New York through western Pennsylvania and extending partly into West Virginia and Ohio. These oils are generally known in the trade as Pennsylvania oils and differ from lubricating oils produced in Texas and California generally in that the Pennsylvania oils have a paraffine base while the Texas and California oils have an asphalt or naphthene base. There are 175 or more separate distributors of these Pennsylvania oils. The Pennsylvania corporate plaintiff sells and distributes its oils in all the States of the Union east of the Rocky Mountains and the California

Company in those States west of the Rocky Mountains.

2. Prior to 1915 the plaintiffs, or their corporate predecessors, sold the oils under the mark of "Pensoil", but in 1915 both Companies adopted, and in 1916 registered, their trade-mark "Pennzoil". This is Plaintiffs' Exhibit No. 1, No. 111,759. Their product has been nationally advertised on a large scale at an aggregate cost of about $12,000,000. The mark has also been registered in numerous foreign countries with export sales of over 5,000,000 gallons. About 150,000,000 gallons of Pennzoil have been sold by the plaintiffs. Their refineries are at or near Oil City, Pennsylvania.

3. The defendant, Crown Central Petroleum Corporation, was originally a Delaware corporation, subsequently by merger becoming a Maryland corporation. For many years it has also been very extensively engaged in the production and distribution of motor lubricating oils. Its refineries are in Texas, and its products are marketed in many States east of the Rocky Mountains and particularly in the south and southeastern States of the Union. Its principal business office is at present in Baltimore, Maryland. In January 1930 it prominently advertised one of its products under the trade-mark or trade name of "Greenzoil". At that time the defendant was marketing its automobile gasoline under the trade name of "Crownzol". For some time prior to 1930 the defendant's research department had been engaged in efforts to produce a motor lubricating oil that would have a pleasing greenish cast. Prior thereto its oil when held up to the light had a reddish color but its cast (reflected light) was an undesirable shade of blue. By 1930 oil had been produced with a satisfactory greenish cast and was ready to be marketed. A meeting of its principal sales agents was held in St. Louis and at that conference, after considering various suggested names for the new oil, "Greenzoil" was adopted as the most satisfactory. "Crownzol" and other names ending in "zol" were considered too closely identified with gasoline to be desirable for the lubricating oil. In January 1930 and at various times thereafter through 1931, the defendant advertised in trade journals its new motor lubricating oil under the prominently displayed name of "Greenzoil" and described it as a "clear green oil".

4. On February 7, 1930, attorneys for the plaintiffs wrote a letter to the defendant protesting its use of "Greenzoil" as an infringement of the plaintiffs' mark "Pennzoil". In March 1930, a Mr. Matthews, then connected with the sales department of the Pennzoil Company, called at the New York office of the defendant and conferred with Mr. Bowles, secretary and technological officer of the defendant, with regard to its adoption and use of "Greenzoil". Mr. Bowles referred to the plaintiffs' letter upon the subject and said that the letter had been referred to counsel for the defendant. Mr. Matthews stated that he did not know the matter had progressed so far and was unaware that the letter had been sent. He further stated that if the mark "Greenzoil" was filed for registration it would lead to litigation. On May 23, 1930, the defendant's attorneys replied to the plaintiffs' protesting letter stating courteously but firmly that they considered its "Greenzoil" mark entirely legal and proper and the defendant would continue to use it. The defendant thereafter continued its advertising of "Greenzoil" for a year or more and continued to sell its lubricating oil under this name in substantial quantities during 1930, 1931 and 1932. Said to be due to water damage, the sales records of the defendant's predecessor (the Delaware corporation) are not complete prior to 1937, and there are no available records to show the marketing of "Greenzoil" in 1934, 1935 and until the latter part of 1936; but thereafter the records show that "Greenzoil" was sold in large quantities through 1937-1942. The defendant did not file the mark "Greenzoil" for registration. The plaintiffs took no further action by correspondence, negotiations or otherwise in opposition to the defendant's use of the term "Greenzoil" until the filing of the suit in this case on July 31, 1941.

5. Prior to about 1936 motor lubricating oils were generally supplied to filling stations in bulk; but beginning about that time the oil companies quite generally adopted the practice of supplying automobile lubricating oils in quart cans bearing distinctive labels of the respective companies with the trade names or trade-marks displayed thereon. Both the plaintiffs and the defendant adopted this changed practice.

6. The customary sales procedure for motor oils at filling stations doubtless varies for different stations, but what is

894

probably a fairly typical procedure is found in the testimony of Frank Nix called as a witness by the defendant, who gave his testimony in open court. For 15 years or more he has operated as the proprietor, a so-called independent filling station at Clifton, N. J. He carries 10 different brands of motor oils including Pennzoil and Greenzoil. He testified that regular customers generally had an established preference for a particular brand of motor oil, as a result of his information to them, and that unless instructed to the contrary he supplied the brand they habitually used. New customers or casual purchasers usually asked for motor oils of a particular price rather than by brand name. Thus some motor oils sell from 30 to 35 cents per quart, as is the case with Pennzoil, other brands for 25 cents, some for as low as 15 cents or two quarts for a quarter. He sold Greenzoil for 20 cents per quart. It is the exception rather than the rule that a chance or casual customer asks for any particular brand of motor oil. He also testified that it was his uniform custom in supplying a quart can of motor oil, to open it in the presence of the purchaser so that the particular brand as displayed on the can could be plainly seen if the purchaser desired to do so. He had never known of any instance of a confusion between Pennzoil and Greenzoil in his sales experience. Joseph E. Chapman, also an independent filling station operator at Clifton, testified generally to the same effect, as did also Marcus Mooney of Shelby, North Carolina. The plaintiffs offered the depositions of other numerous filling station operators or attendants at various places principally in the southeastern States. None of them testified to any instance within their knowledge of actual confusion in purchase between the two brands, but many of them testified that purchasers called attention to the cans of Pennzoil and Greenzoil when displayed in racks at the filling stations and some purchasers asked the question as to whether the two oils were put out by the same company or what was the difference between them or whether they were "sister oils", and a few purchasers had said to attendants they assumed "Greenzoil" was a product of the "Pennzoil" company, and other attendants testified to casual or temporary seeming confusion of customers between the two brands due to the similarity of the syllable "zoil" in both names. There was also evidence that some of the distri-

butors of motor oils sell two grades of oil under variant trade names, as for instance, Veedol and Tydol, both products of the Tidewater Oil Company of Pennsylvania.

7. As to the issue of unfair competition, there is no evidence in the case of any intentional simulation by the defendant of the plaintiffs' product and none by the distributors of the defendant's oil, nor any deceptive trade practice of any kind. The defendant sells directly only to jobbers who in turn distribute to retail filling stations. There is no similarity between the appearance of the quart cans in which the respective oils of the parties are sold at retail. Both cans are cylindrical and are about the same size, each containing a quart of oil. This is the common trade practice. The color arrangement and style of the respective cans is conspicuously different. The prominent colors of the plaintiffs' cans are yellow and black; while those of the defendant are white and green. The plaintiffs' label emphasizes that "Oil is 100% pure Pennsylvania oil". The distinctive device is the word "Pennzoil" overlapping the design of a Liberty Bell (in red) suggestive of course, of the Liberty Bell in Independence Hall in Philadelphia. The defendant's label has no such device, its most prominent feature being the name "Greenzoil" in green letters on a white background. The respective cans also clearly carry the name and address of the respective makers.

On the whole case, my conclusion is that the complaint should be dismissed for the following reasons.

■■■ *Is "Pennzoil" a valid trademark?* For the purposes of this case I will assume that it is, although there is force in the defendant's contention that it is merely descriptive of the plaintiffs' product. While the mark has been in use since 1915 it was not registerable under the ten-year clause of 15 U.S.C.A. § 85. One of the well established rules with regard to trade-marks is that a mark is not good if it is merely descriptive of the product to which it is applied; but it is good if the mark is merely suggestive rather than descriptive. An outstanding illustration of a good mark which is suggestive only was, before National Prohibition, the trademark of Maryland Hunter Rye Whiskey which depicted a horse with rider in hunting costume leaping a fence accompanied by the legend "Maryland Hunter Rye—First Over the Bars".

The question as to Pennzoil is whether it is merely descriptive. As has been above stated, prior to adopting "Pennzoil" the plaintiffs for a time used the mark "Pensoil" and when they desired to register "Pennzoil" they found previously registered a mark "Penn-Oil" which they acquired to avoid possible opposition. The witness Brown, an officer of the plaintiff Pennsylvania company, said that in considering a substitute for Pensoil it was their desire to obtain a name "that was unique, some name what we could advertise under and which would be suggestive of our product. Several suggestions were made and we for a while in the Pennsylvania corporation used the word Pensoil. This was not considered satisfactory, and some one in our California corporation suggested changing the 's' to 'z'. This gave us a word which was easily spoken, and we believed would be successfully sold to the trade."

■ If "Pennzoil" were an entirely new mark now offered for registration for the first time, it would be difficult to hold it to be a valid trade-mark as a unique and arbitrary word, and not a descriptive term. We must bear in mind that there is a sharp distinction in the trade in motor lubricating oils between Pennsylvania oils on the one hand and Texas and California oils on the other; and the plaintiffs' product is not only exclusively a Pennsylvania oil but has been extensively and intensively advertised as such and is well known in the trade as a Pennsylvania oil. Clearly the mark or name "Pennsylvania's Oil" would be geographically descriptive and not a valid technical trade-mark. "Pennzoil" is quite obviously merely an abbreviation for the former term with the misspelling of "z" for "s". And as the plaintiffs' representative said, made the abbreviated word more easily spoken. It is also to be noticed that in the form of the mark as registered and in the advertisements of the mark until 1939, there was little, if any, emphasis placed on the letter "z", nor was the use of "z" in connection with lubricating oils a particularly unique or distinctive thing in the trade in 1915 as there was then on the market a brand of oil known as "Oilzum", said to have been a contraction of "Oils Them". And other uses of "z" in connection with motor oils has not been uncommon. The defendant's registered trade-mark or name of "Crownzol" is an instance. "Oklazoil", "Bluzol" and "Kolzol" have also been registered as trade-marks. It is therefore quite arguable that the only change made in the descriptive word of "Pensoil" (formerly used by the plaintiffs' predecessors) was to add an "n" and change the "s" to a "z" and thus endeavor to acquire a valid mark by misspelling. This ordinarily cannot successfully be done. Standard Paint Co. v. Trinidad Asphalt Co., 220 U.S. 446, 31 S. Ct. 456, 55 L.Ed. 536; A. L. I. Restatement of Torts, s. 725; Derenberg, Trade-Marks, p. 264. And it is, superficially at least, rather difficult to distinguish "Pennzoil" as a valid trade-mark from a number of cases in this Fourth Circuit which have held descriptive marks to be invalid. In Bliss, Fabyan & Co. v. Aileen Mills, 4 Cir., 25 F.2d 370, the word "Ripplette" for bed spreads was held merely descriptive of the ripple woven into the spread in puckered or crinkled strips separated from each other by strips of flat woven material, and the owner of the mark was not entitled to enjoin the use of the mark "Krinklette" on goods of similar character. In Griffin Mfg. Co. v. It Shoe Polish Co., 4 Cir., 80 F.2d 514, the word "AllWite" for a shoe polish was held merely descriptive although misspelled, and the owner not entitled to enjoin the defendant from using the words "All White" on similar goods. In Chapin-Sacks Mfg. Co. v. Hendler, 4 Cir., 254 F. 553, "The Velvet Kind", for ice cream, was held descriptive only.

■ Nevertheless there are some considerations which tend to support the validity of the mark. It has had considerable administrative recognition as valid. It was originally federally registered in 1916 and renewed for 20 years in 1936. 15 U.S.C.A. § 85, provides what trade-marks may be registered. Among other provisions is one which denies registration of marks "which are descriptive of the goods with which they are used, or the character or quality of such goods, or merely a geographical name or term;" with the further proviso, however, "that nothing herein shall prevent the registration of any mark used by the applicant or his predecessors, or by those from whom title to the mark is derived, in commerce with foreign nations or among the several States or with Indian tribes which was in actual and exclusive use as a trade-mark of the applicant, or his predecessors from whom he derived title, for ten years next preceding February 20, 1905." The mark

was not registered under this ten-year provision. Section 96 provides that the registration of a trade-mark "shall be prima facie evidence of ownership". The statute is silent as to whether the registration is also prima facie evidence of validity; but it has been said in this Circuit that such registration "furnishes a strong presumption of its validity", although this presumption is, of course, rebuttable. Chapin-Sacks Mfg. Co. v. Hendler Creamery Co., 4 Cir., 254 F. 553, 556; Autoline Oil Co. v. Indian Ref. Co. D.C., 3 F.2d 457, Soper, J. The Court of Customs and Patent Appeals has also supported the validity of "Pennzoil" to the extent that in a statutory proceeding under 15 U.S.C.A. § 93, it has cancelled the registration of the competing mark "Pencoil" for motor lubricating oil because confusingly similar to "Pennzoil". Pennsylvania Pet. Co. v. Pennzoil Co., 80 F.2d 67, 23 C.C.P.A., patents, 706. Compare Pennzoil Co. v. Hercules Powder Co., 100 F.2d 671, 26 C.C.P.A., patents, 757, and Hall v. Pennzoil Co., C.C.P.A., 126 F.2d 506. Of course these cases did not involve common law rights as the administrative court was without jurisdiction to determine them. Since its original registration the plaintiffs have continuously used the mark "Pennzoil" for more than 25 years and have very widely and extensively advertised the mark nationally. It is said that there are about 175 separate producers of Pennsylvania lubricating oil, any one of whom, it would seem, could have used the name "Pennzoil" if it is a purely descriptive term; but apparently none of them have sought to do so. The plaintiffs have also been exceedingly active in opposing the registration of other marks thought to be confusingly similar; and it has been quite uniformly successful in such statutory opposition proceedings although it appears that nearly all of them were really uncontested. In these circumstances it seems probable that the plaintiffs might have been able to establish a "secondary meaning" for "Pennzoil" upon proper proof, but no such contention has been made, possibly because in this case it was thought it would not be sufficient to entitle the plaintiffs to an injunction, in the entire absence of any features of unfair competition by the defendant. In Indian Territory Oil & Gas Co. v. Indian Territory Illuminating Oil Co., 10 Cir., 95 F.2d 711, 713, it was said: "When restricted to their primary meaning, geo-graphical words are not capable of exclusive appropriation; but where they have been used so long and so exclusively by a manufacturer, trader, or distributor in connection with his wares and merchandise that they are generally understood to mean and denote such wares and merchandise, they acquire a secondary meaning apart from their primary meaning; and he may enjoin another from using them *if the use causes deceit and injures his business."* (Italics supplied) See also Dixi-Cola Laboratories, Inc., v. Coca-Cola Co., 4 Cir., 117 F.2d 352, 354, and Elgin Nat. Watch Co. v. Elgin Razor Corp., D.C. Ill., 25 F.Supp. 886. Cf. Derenberg on Trade-Marks, p. 325 et seq.

Although I am personally inclined to the view that by the better legal reasoning the name "Pennzoil" does not constitute a valid technical trade-mark, it is unnecessary to put the decision of this case on that point, as it is at least debatable, and the determination in doubtful cases, to a large extent, as in the case of the validity of a patent when the feature of novelty is in issue, must necessarily be largely subjective with the particular judge. See Derenberg on Trade-Marks, pp. 269, 275. Whatever the uncertainty as to the status of "Pennzoil" as a technical trade-mark, I think it clear that, if it be assumed that it does constitute a good technical mark, nevertheless it is not one of such unique and distinctive character as entitles it to the broad range of protection claimed for it by the plaintiffs. See Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347.

*Laches.* Defendant contends that in any event the plaintiffs should be estopped from demanding an injunction in this case by reason of their delay in litigating the matter, while, in the meantime, the defendant was building up a very substantial business in the sale of its product under the name of "Greenzoil". The facts on this branch of the case have been stated and need not be here repeated in detail. It is sufficient to note that in 1930 defendant first advertised and began the use of the name "Greenzoil". It immediately came to the attention of the plaintiffs who protested and threatened litigation; but the defendant firmly insisted on its rightful use of the name and continued to use it thereafter (with the possible exception of the years 1934–5) for about ten years and until this suit was finally brought. The

plaintiffs contend on the evidence that the name "Greenzoil" was not largely used by the defendant until 1937 and that its use in any substantial amount did not come to the attention of the plaintiffs until about a year before the suit was brought. If this is the correct inference from the evidence, it seems obvious that "Greenzoil" has had little or no effect on the plaintiffs' business, although it was certainly very extensively used by the defendant in the five-year period from 1936 to 1941. I think the sounder view, however, is that the plaintiff really did not regard "Greenzoil" as a substantial colorable imitation of its own mark of "Pennzoil" until in 1939 for the first time it began to attribute large importance to the "z" in "Pennzoil", as evidenced by its advertising then begun, under the slogan "Sound your 'Z'."

■ I find that there was at least a sufficient delay on the part of the plaintiffs in seeking a judicial determination of this case, to bar the right to an accounting for profits and damages. W. G. Reardon Lab. v. B. & B. Exterminators, 4 Cir., 71 F.2d 515, 518; Valvoline Oil Co. v. Havoline Oil Co., D.C., 211 F. 189; McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828. But it is not so clear that the plaintiffs are disentitled to an injunction as to the continued use of "Greenzoil", if the plaintiffs have a valid trade-mark in "Pennzoil", and "Greenzoil" is a colorable imitation thereof. McLean v. Fleming, supra. In Menendez v. Holt, 128 U.S. 514, 523, 9 S.Ct. 143, 145, 32 L.Ed. 526, it was said: "Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long, and under such circumstances, as to defeat the right itself." To the same effect is Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 39, 21 S.Ct. 7, 45 L.Ed. 60, and Chapin-Sacks Mfg. Co. v. Hendler Creamery Co., 4 Cir., 254 F. 553, 558. On the other hand, the facts in the instant case with respect to laches are quite similar to those involved in Valvoline Oil Co. v. Havoline Oil Co., D.C.S.D.N.Y., 211 F. 189, where it was held that the plaintiff's laches disentitled it to an injunction to protect its admitted trademark "Valvoline" against the defendant's use of "Havoline" On the facts the court first determined that Havoline was not a colorable imitation of Valvoline, but on the point of laches, it was held that the plaintiff was not entitled to an injunction even

though the question of colorable imitation was only seriously debatable. It was said, 211 F. at page 194: "Where a trade-mark is bodily appropriated, as in Menendez v. Holt, the courts will grant injunctive relief, although in some instances denying an accounting. * * * But this is not such a case. It must be admitted, even if it were to be held that the defendants infringed complainant's trade-mark, that the question involved is seriously debatable. I am of opinion that equity as applied to modern business developments requires that, in this particular case, injunctive relief in any event be denied. No satisfactory explanation is given for the delay, and, during that time, the defendants have spent thousands of dollars to create a valuable asset in the word 'Havoline'." Even if the plaintiffs' laches in the instant case are not so pronounced as to amount to an estoppel against the injunction sought, its delay is a significant circumstance bearing on the question whether it really regarded "Greenzoil" as a prejudicial infringement of "Pennzoil". The delay tends very strongly to support the conclusion that the plaintiffs did not so regard "Greenzoil".

■ *Is Greenzoil a colorable imitation of Pennzoil?* I think not—in the circumstances here present. In other circumstances it is conceivable that "Greenzoil" might be considered a colorable imitation of "Pennzoil". It is true that six letters in the alphabet forming the word "Greenzoil" also appear in the word "Pennzoil". And if "Pennzoil" was a purely arbitrary mark not describing or suggesting either "oil" or "Pennsylvania", but some entirely different product, "Greenzoil" applied to the same kind of product might be regarded as colorable imitation. But that is not the situation here. Both marks are applied to automobile lubricating oil and when so applied there is no special significance to the letter "z" other than making the pronunciation of the word somewhat easier. Then again "Pennzoil" as a mark for Pennsylvania lubricating oil is distinctly descriptive or at least suggestive and the plaintiffs have prominently emphasized this in the legends on their cans, and in their advertising. "Greenzoil" carries no such suggestion with respect to the geographical origin of the oil. Its suggestiveness is of color, green.

There was no intentional simulation or colorable imitation by the defendant in

adopting the word "Greenzoil". There was at least as good a reason for its adoption by the defendant as in the case of "Pennzoil" by the plaintiffs. The defendant had used the letter "z" in its own registered mark of "Crownzol" for gasoline. "Greenzoil" rather than "Greenzol" was adopted because "zol" was identified with gasoline rather than with lubricating oils. "Greenzoil" does not in any way suggest to a purchaser the thought that he is buying a Pennsylvania oil as distinct from Texas or California oil. If the plaintiffs had used the mark "Penn-Oil" and the defendant "Green-Oil", it is not contended there would have been any basis for this suit. The charge of colorable imitation is, therefore, reduced merely to the use of the letter "z". This is too slender a basis to make successful the charge of colorable imitation especially when we remember that the plaintiffs substituted "z" for "s" because it was more phonetic.

The plaintiffs apparently seek to assert a monopoly right in the use of "zoil" as the second syllable of "Pennzoil" and base their charge of colorable imitation by "Greenzoil" thereon. But this contention is not sound. It is the first syllable of both words that is here dominant in speech and thought also. In Coca-Cola Co. v. Carlisle Bottling Works, D.C., 43 F.2d 101, 114, affirmed 6 Cir., 43 F.2d 119, certiorari denied 282 U.S. 882, 51 S.Ct. 86, 75 L.Ed. 778, it was said, after a long review of competing trade-marks, on the issue of alleged colorable imitation: "I think, therefore, that I am justified in drawing from this survey the general rule that in such cases where the front part of the two trade-marks involved differ in appearance, sound, and meaning, there is no infringement even though there may be similarity amounting to identity in the last parts. It is only a very exceptional case which will not be governed by this rule." See also Glenmore Distilleries v. National Distillers Product Corp., 4 Cir., 101 F.2d 479, note 1 ("Kentucky Tavern" and "Town Tavern"); and Hall v. Pennzoil Co., 126 F.2d 506, 29 C. C.P.A., patents, 933.

 Counsel for the plaintiffs have filed a lengthy brief with elaborate discussion both of the law and facts and the citation of more than a hundred different trade-mark cases. With the general principles of trade-mark law that are applicable to this case, I find little to question in the plaintiffs' discussion, but I am unable to make the application to the facts contended for. Due effect should of course be given to the fact that the mark is federally registered, but it is now well established that the result of such registration is procedural and not substantive. 15 U.S.C.A. § 96 authorizes the assessment of damages against "any person who shall * * * colorably imitate any such trade-mark" etc., in a suit at law. And section 99 provides for an injunction and accounting for profits and damages upon similar infringement. The leading case in the Supreme Court of McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828, furnishes the legal test as to what constitutes colorable imitation of a trade-mark. On page 251 of 96 U.S., 24 L.Ed. 828 in that case the court said:

"What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases. All that courts of justice can do, in that regard, is to say that no trader can adopt a trade-mark, so resembling that of another trader, *as that ordinary purchasers, buying with ordinary caution, are likely to be misled.*" (Italics supplied)

Again on page 253 of 96 U.S., 24 L.Ed. 828:

"Much must depend, in every case, upon the appearance and special characteristics of the entire device; but it is safe to declare, as a general rule, that exact similitude is not required to constitute an infringement or to entitle the complaining party to protection. If the form, marks, contents, words, or the special arrangement of the same, or the general appearance of the alleged infringer's device, is such as would be likely to mislead one in the ordinary course of purchasing the goods, and induce him to suppose that he was purchasing the genuine article, then the similitude is such as entitles the injured party to equitable protection, if he takes seasonable measures to assert his rights, and to prevent their continued invasion."

And still again on page 255 of 96 U.S., 24 L.Ed. 828:

"Colorable imitation, which requires careful inspection to distinguish the spurious trade-mark from the genuine, is sufficient to maintain the issue; but a court of equity will not interfere, when ordinary attention by the purchaser of the article would enable him at once to discriminate the one from the other. Where the simi-

larity is sufficient to convey a false impression to the public mind, and is of a character to mislead and deceive the ordinary purchaser in the exercise of ordinary care and caution in such matters, it is sufficient to give the injured party a right to redress, if he has been guilty of no laches."

And on page 256 of 96 U.S., 24 L.Ed. 828:

"Two trade-marks are substantially the same in legal contemplation, if the resemblance is such as to deceive an ordinary purchaser giving such attention to the same as such a purchaser usually gives, and to cause him to purchase the one supposing it to be the other."

This test was quite recently applied by the Circuit Court of Appeals for this Circuit in Glenmore Distilleries Co. v. National Distillers Product Corp., 4 Cir., 101 F.2d 479, 480, where Judge Soper, speaking for the Court, also said:

"It is impossible to lay down a general rule that either word in an established trademark of two words is of such importance that its use in other combinations on the same kind of goods would constitute infringement. Every case must of course be decided upon its own facts."

In that case the mark "Town Tavern" on whiskey was held not to infringe the mark "Kentucky Tavern" also applied to whiskey.

The same principle has been frequently applied in other trade-mark cases in this Circuit. Dixi-Cola Labs., Inc., v. Coca-Cola Co., 4 Cir., 117 F.2d 352; Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347; Pepsi-Cola Co. v. Krause Bottling Co., 4 Cir., 92 F.2d 272; Griffin Mfg. Co. v. It Shoe Polish Co., 4 Cir., 80 F.2d 514; Bliss, Fabyan & Co. v. Aileen Mills, Inc., 4 Cir., 25 F.2d 370; Chapin-Sacks Mfg. Co. v. Hendler Creamery Co., 4 Cir., 254 F. 553; Coca-Cola Co. v. Old Dominion Beverage Corp., 4 Cir., 271 F. 600; W. G. Reardon Lab., Inc., v. B. & B. Exterminators, 4 Cir., 71 F.2d 515; Autoline Oil Co. v. Indian Ref. Co., D.C., 3 F.2d 457, Soper, J. In view of the very full discussion of the subject matter in these numerous recent cases in this Circuit it would be an act of supererogation to undertake an elaborate review of the application of the well established principles as illustrated in the many other trade-mark cases cited by plaintiffs' counsel from other jurisdictions. While it would doubtless be impossible to harmonize all the cases in their final results, any difficulty in the matter is not with the law but with its application to the facts; and this necessarily remains a matter for judgment on the facts of each particular case.

In the instant case the evidence is not impressive that there is any reasonable likelihood of confusion by virtue of the names used by the respective parties. The principal testimony relied upon by the plaintiffs is that of a number of filling station attendants that some purchasers of motor lubricating oil have at times asked the question as to whether "Greenzoil" was a product of the same company that put out "Pennzoil", and other similar questions indicating possibly some casual confusion from similarity of names. The mere fact that such questions have been asked does not show confusion in the public mind as to identity but only that the question occurred to the purchaser. It does not show even likelihood of confusion in actual purchase, when the entire dissimiliarity of the respective packages is considered. The fact that the question was asked rather indicates that the inquirer was put on notice of the difference between the names. If after such notice he nevertheless persisted in buying "Greenzoil" for "Pennzoil" he was not acting with even ordinary caution. And the evidence fails to show any instance in which the purchaser has actually bought "Greenzoil" thinking he was getting "Pennzoil", in the many years the former has been on the market.

■ Representatives of the plaintiff apparently conducted a very wide survey of the conditions under which "Greenzoil" was sold at filling stations, particularly in the southern States, and selected as a result of this survey about forty filling stations attendants who were examined by counsel for the plaintiffs for the particular purpose of developing alleged confusion of the buying public. The general effect of their testimony by deposition has heretofore been briefly summarized. This kind of testimony in trade-mark and unfair competition cases is often and perhaps generally of little weight, and in the present case I do not feel that it is impressive. See "The Unwary Purchaser" 8 Mich. Law Rev. 613, 618; Dixi-Cola Laboratories v. Coca-Cola Co., 4 Cir., 117 F.2d 352, 360; DuPont Celophane Co. v. Waxed Prod. Co., 2 Cir., 85 F.2d 75, 80; Quaker Oats Co. v. General Mills, 7 Cir., 134 F.2d 429,

431. Only occasional cases of confusion or thoughtless errors. by very inattentive purchasers are of little significance. Valvoline Oil Co. v. Havoline Oil Co., D.C., 211 F. 189, 194; Quaker Oats Co. v. General Mills, 7 Cir., 134 F.2d 429, 432; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 121, 59 S.Ct. 109, 83 L.Ed. 73; Restatement, Torts, s. 728, Comment A.

On the point of likelihood of confusion, counsel for the plaintiffs stress what is urged as to the conditions of retail sales of motor oils; that purchasers represent all classes of the community, the illiterate as well as the literate; that a quart of oil is sold for a comparatively small price (say 20 to 35 cents); that sales are usually quickly made and often under circumstances of noise and confusion from traffic. It is also pointed out that purchases are often made from memory alone and that memory may be defective from either visual or oral impressions. Finally, it is particularly urged that confusion of the public may result either with respect to the goods themselves or the origin of the goods; and also that in the modern law of business colorable imitation of a trade-mark is prejudicial to the quasi-property interest in the trade-mark itself especially where it has been much advertised. Schechter, "The Rational Process of Trade-Mark Protection", 40 Har.Law Rev. 831, 832; Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347, 351. And see Restatement, Torts, § 729, for a list of the principal factors to be considered on the question as to whether there is confusing similarity. But, giving due weight to all these considerations, I am still of the opinion that, on the evidence in this case, there is no likelihood of confusion or deception of the ordinary purchaser buying with ordinary care the respective articles of the parties.

It is true that in deciding cases of this nature the chancellor should be careful not to give too much weight to his own subjective appraisal of the competing trade names or labels. On the contrary it is important that the more objective tests furnished by the evidence as to what reasonably should constitute ordinary caution of the ordinary purchaser should be carefully considered. But the quality of the evidence must be considered along with its quantity. And the final decision must necessarily be the judgment of the chancellor based on his own observation of the physical exhibits in connection with the other relevant facts in the case. So far as the physical exhibits in the case are concerned, I think it beyond question that even a careless buyer could not mistake defendant's product for that of the plaintiffs when buying upon inspection of the two cans of oil, or even when relying only on memory of sight of the plaintiffs' can or sound of "Pennzoil". Nor does the name "Greenzoil" suggest "Pennzoil". The idea conveyed by "Pennzoil" is clearly that of Pennsylvania oil as indeed is conspicuously emphasized on the can itself; and equally clearly the name "Greenzoil" does not suggest a place but a color; and the prominently displayed color of the label on the can itself tends to emphasize this idea.

Counsel may submit the appropriate order for the entry of judgment for the defendant, the plaintiffs to pay the taxable court costs.